Paul S. ADAMIAN, Plaintiff-Appellee,

v.

Harold J. JACOBSEN et al.,
Defendants-Appellants.

No. 73–2921.

United States Court of Appeals,
Ninth Circuit.

Sept. 24, 1975.

Jeffrey G. Greene (argued), Deputy Atty. Gen., Las Vegas, Nev., for defendants-appellants.

Charles E. Springer (argued), Reno, Nev., for plaintiff-appellee.

## OPINION

Before MERRILL, CARTER and CHOY, Circuit Judges.

CHOY, Circuit Judge:

Paul S. Adamian, a tenured Assistant Professor of English at the University of Nevada at Reno, participated in a demonstration during Governor's Day ceremonies in the campus stadium in 1970, protesting the Cambodia invasion and the Kent State University killings. On prior application of the demonstrators, the Board of Regents (the Board) had given them permission to march three times around the stadium track. The protest went beyond the march, however. Adamian (yelling, "Let's stop this mother _ _ _.") and others tried to stop a motorcade bringing officials for the ceremonies into the stadium; led by Adamian the demonstrators then made loud noises to disrupt the ceremonies. Still later, Adamian left the stands, joined a group on the field and motioned other demonstrators onto the field, thus creating a danger of violent confrontation between two bodies of people.

The Board directed that charges be brought against Adamian. He was summoned before a Faculty Senate hearing committee which found that his conduct had violated chapter 4, section 2.3, of the University Code, and thus constituted "adequate cause" under the Code for his dismissal. Although the committee recommended that his employment not be terminated unless he indulged in similar conduct in the future, the Board rejected the recommendation and ordered Adamian's dismissal.

Adamian brought this civil rights action in district court, claiming that the University had deprived him of his first amendment rights of speech and assembly. On July 20, 1973, the district court held that section 2.3 was invalid because vague and overbroad. The court entered partial summary judgment for Adamian, and ordered the present members of the Board of Regents in their representative capacities to reinstate Adamian. It also ordered back pay for Adamian in an amount to be later determined. On August 30, 1973, the court certified its order of reinstatement as a final judgment, pursuant to Fed.R.Civ.P. 54(b). The members of the Board appeal from that order. We reverse and remand.

### Jurisdiction on Appeal

The July 20 order granting an injunction was an appealable interlocutory order. 28 U.S.C. § 1292(a)(1). Because the regents did not file an appeal from this order within 30 days as required by 28 U.S.C. § 2107, Adamian argues that the regents' appeal is untimely. But an interlocutory appeal is permissive, not mandatory, and the regents were free to await the August 30 final judgment and to appeal under 28 U.S.C. § 1291. *Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 591 n.1 (5th Cir. 1967); *Bingham Pump Co. v. Edwards,* 118 F.2d 338, 339 (9th Cir.), *cert. denied,* 314 U.S. 656, 62 S.Ct. 107, 86 L.Ed. 525 (1941).

### University Code, Section 2.3

The University Code of the University of Nevada requires that tenured professors be dismissed only for adequate cause, and the Board of Regents concluded that "adequate cause existing, [Adamian's] employment as a member of the Faculty of the University of Nevada,

Reno is terminated this date." The term "adequate cause" must be interpreted in the context of traditional standards of faculty behavior; its vagueness is a necessary result of the many forms of faculty conduct which might justify dismissal. The Supreme Court's discussion of "cause" for dismissal from the civil service applies equally to academic tenure:

> We do not believe that Congress [here, the state] was confined to the choice of enacting a detailed code of employee conduct, or else granting no job protection at all.

*Arnett v. Kennedy*, 416 U.S. 134, 159, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974).

■■■ Nevertheless, when a statute or regulation by its vagueness or overbreadth threatens to deter the exercise of first amendment freedoms, we require of it greater precision and specificity than would be necessary to fulfill fifth or fourteenth amendment due process requirements. "Adequate cause" is certainly too imprecise a standard if expressive activity is understood to fall within its scope. If we were faced with a federal statute or regulation, we would cure this imprecision by construing it to exclude any application to constitutionally protected speech or conduct. *Arnett,* 416 U.S. at 162, 94 S.Ct. 1633; *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). We cannot so construe a state regulation, however; we are required to base our judgment of its facial validity only on its meaning as authoritatively construed by a state court or agency. *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

■■ The University Code, chapter 4, section 2.3, clarifies the meaning to be given "adequate cause" when that term is applied to a professor's expressive activity:

> The faculty member is a citizen, a member of a learned profession, and a representative of the University. When he speaks or writes as a citizen, he will be free from university censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and as an educator, he knows that the public may judge his profession and this University by his utterances. At all times he strives to be accurate, to exercise appropriate restraint, to show respect for the opinion of others, and to make every effort to indicate that he is not a spokesman for this University.

Section 2.3, read in isolation, seems only to insure that a professor will be free of censorship when speaking as a citizen; the admonitions of the last sentence appear merely hortatory. The Board of Regents has construed the last sentence as stating adequate causes for dismissal, however, and we must give great deference to this construction of a regulation by the state agency which issued and enforces it. *See Jablon v. Trustees of the California State Colleges,* 482 F.2d 997, 999 (9th Cir. 1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). The regents explicitly charged Professor Adamian with having violated this section, and we accept it as defining the university's construction of "adequate cause" for dismissal of a professor based on his non-academic speech or writing.[1]

---

1. *See* Interpretation 3 of the 1940 Statement of Principles, agreed upon by the Association on Nov. 7–8, 1940:

   If the administration of a college or university feels that a teacher has not observed the admonitions of Paragraph (c) of the section on Academic Freedom [section 2.3] and believes that the extramural utterances of the teacher have been such as to raise grave doubts concerning his fitness for his position, it may proceed to file charges under Paragraph (a)(4) of the section on *Academic Tenure.* In pressing such charges the administration should remember that teachers are citizens and should be accorded the freedom of citizens. In such cases the administration must assume full responsibility and the American Association of University Professors and the Association of American Colleges are free to make an investigation. Academic Freedom and Tenure: A Handbook of the American Association of University Professors 39 (1969).

*Vagueness and Overbreadth*

■ The closely related first amendment doctrines of vagueness and overbreadth permit a defendant to assert the invalidity of a statute because of its potential encroachment on first amendment freedoms, even in cases where the defendant's conduct itself is unprotected by the first amendment. We apply these doctrines quite rigorously when a statute is directed at "pure speech," especially to its expressive content. *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).[2] On the other hand, if the state has attempted to regulate conduct for reasons unrelated to any expressive content, and the regulation has an incidental inhibiting effect on expression, in determining its facial validity we must weight the legitimate interest of the state in regulating the conduct against the potential deterrence, or "chill," of the exercise of first amendment freedoms. *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).[3] The balancing required of us in deciding whether to apply the vagueness and overbreadth doctrines resembles that required in determining whether a statute regulating conduct constitutes an impermissible abridgement of first amendment interests. *See,*

*e. g., Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

■ Section 2.3 requires that a professor strive for accuracy, restraint, and respect for the opinions of others. On its face, section 2.3 is directed at "pure speech," not at expressive conduct. The state cannot regulate any protected speech on the basis of content. *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Even in the case of "pure speech," however, the deference which must be accorded first amendment interests attenuates when the state attempts to regulate not the expressive content of the speech, but its external effects, such as noise. *Grayned, supra; Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 413 (1949); *contrast Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

■ Section 2.3 is neutral as to content; it regulates the manner in which that content is expressed, much as do statutes aimed at excessive noise. Therefore, in examining its facial validity, we find it appropriate to apply the more rigorous *Broadrick* test, *i.e.,* whether any overbreadth perceived is "not only . . . real, but substantial as well, judged in relation to the statute's

---

**2.** The Supreme Court has apparently applied the overbreadth doctrine equally rigorously to topless dancing as a form of expression. The Court, in an opinion by Mr. Justice Rehnquist, held facially invalid a town ordinance banning all topless dancing, observing that it had suggested in *California v. LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), that some topless dancing might be entitled to first amendment protection. The Court did not engage in a *Broadrick*-type analysis to determine the legitimate scope of such an ordinance in relation to its possible application to protected expressive activity. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

**3.** In *Parker,* the Court dismissed overbreadth challenges to the military regulations prohibiting conduct "unbecoming an officer and a gentleman" and "to the prejudice of good order and discipline in the armed forces." The court held that the " ' "weighty countervailing policies," ' *Broadrick, supra,* [413 U.S.] at 611 [93 S.Ct. 2908], which permit the extension of standing in First Amendment cases involving civilian society, must be accorded a great deal less weight in the military context." 417 U.S. at 760, 94 S.Ct. at 2564.

**934**

plainly legitimate sweep." *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2918.

First amendment protections are not "shed . . . at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is true that we will strike the balance between the interests of the state and of the individual somewhat differently when the citizen is an employee of the state. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The desire to maintain a sedate academic environment, "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," is not an interest sufficiently compelling, however, to justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms. *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. *See Los Angeles Teachers Union v. Los Angeles City Board of Education,* 71 Cal.2d 551, 78 Cal.Rptr. 723, 455 P.2d 827 (1969). Only where expressive behavior "involves substantial disorder or invasion of the rights of others" may it be regulated by the state. 393 U.S. at 513, 89 S.Ct. at 740. Self-restraint and respect for all shades of opinions, however desirable and necessary in strictly scholarly writing and discussion, cannot be demanded on pain of dismissal once the professor crosses the concededly fine line from academic instruction as a teacher to political agitation as a citizen—even on the campus itself.

On its face, section 2.3's requirement that a professor exercise appropriate restraint and show respect for the opinions of others is susceptible of interpretations which would render it overbroad under *Tinker,* and would thus deter the vigorous advocacy of unpopular political ideas. We take notice, however, that section 2.3 was adopted almost verbatim from the 1940 Statement of Principles of the American Association of University Professors. Academic Freedom and Tenure: A Handbook of the American Association of University Professors 36 (1969). In 1963, the Association construed the Statement's language regarding academic freedom in its Advisory Letter No. 11: Extramural Utterances. Handbook at 132–34:

> It is the view of this Office that the term 'appropriate restraint,' as used above, refers solely to choice of language and to other aspects of the manner in which a statement is made. It does not refer to the substance of a teacher's remarks. * * *
>
>> 'A violation may consist of serious intemperateness of expression, intentional falsehood, incitement of misconduct, or conceivably some other impropriety of circumstance. It may not lie, however, in the error or unpopularity, even though gross, of the ideas contained in the utterance.'
>
> [A] determination concerning alleged violation of the standard of academic responsibility may not be made except on the basis of the criteria elaborated above. * * *
>
> [A]cademic consideration of the extramural utterances of a faculty member shall occur only when the remarks raise 'grave doubts' concerning his fitness for his position . . . .
>
> [T]he disciplining of a faculty member for exercising the rights of free speech guaranteed to him as a citizen by the Constitution of the United States necessarily raises such fundamental issues that institutions are cautioned to take such action only under extraordinary circumstances. Neither the error nor the unpopularity of ideas or opinions may provide an adequate basis for such disciplinary action, whatever temporary embarrassment these views may bring to the institution.

The Association's construction so narrows the language of section 2.3 as to

eliminate any overbreadth resulting in facial invalidity of the section. The Handbook emphasizes that section 2.3 does not "refer to the substance of a teacher's remarks." Moreover, the Association's repeated assurance that a professor will not be penalized for the error or unpopularity of his ideas reassures us that the Association intended to assure a professor his full measure of first amendment rights. While the Association's construction is itself not entirely free of overbreadth problems,[4] we believe that it circumscribes within constitutional limits, insofar as is practicable, those situations in which a faculty member is subject to discipline. Any overbreadth remaining in the Association's interpretation of proper grounds for dismissal falls short of *Broadrick's* requirement of "substantial overbreadth."

That the University has adopted the Statement of Principles virtually word for word suggests that it also accepts the narrowing interpretation placed on it by the Association. We remand the case to the district court with instruction to hear testimony from the regents in order to determine whether the regents' construction of section 2.3 is the same as that of the American Association of University Professors.

Reversed and remanded.

---

4. We might have some doubt whether the phrase "serious intemperateness of expression," standing alone, would provide a sufficiently narrow standard for a professor's "extramural" speech. Nevertheless, the Association emphasizes that such a lack of restraint does not per se justify dismissal, but only when it raises "grave doubts" concerning the professor's fitness for his position. While even this latter standard is somewhat susceptible to an overbroad application, we do not believe that such a standard encompasses so much protected speech as to render section 2.3 "substantially" overbroad. Whatever overbreadth lingers in the section may be cured on a case-by-case basis in those situations where the section is applied to punish the exercise of protected speech.