**Rendell Noel MABEY, Jr., Plaintiff-Appellee,**

v.

**Ronald REAGAN et al., Defendants-Appellants.**

**No. 74–3413.**

United States Court of Appeals, Ninth Circuit.

June 1, 1976.

Rehearing Denied June 24, 1976.

Robert Leberman, Deputy Atty. Gen. (argued), San Francisco, Cal., for defendants-appellants.

E. Mark Himelstein (argued), of Himelstein & Savinar, San Francisco, Cal., for plaintiff-appellee.

## OPINION

Before MERRILL and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

---

\* Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

1. All references to the California Administrative Code are to those provisions in effect at the date of Mabey's non-retention, November 25, 1970.

2. Originally five others were joined in this action. The plaintiffs had failed to exhaust available administrative modes of review. Assuming the adequacy of the administrative procedures, they were therefore unable to state a claim under the Civil Rights Act for denial of procedural due process; therefore, the court

HUFSTEDLER, Circuit Judge:

Mabey, a former untenured faculty member at Fresno State College [the "College," now California State University at Fresno], brought suit under 42 U.S.C. § 1983 against the Trustees of the California State Colleges, the Chancellor of the State College System and the President of the College [collectively herein called the "College" or the "appellants"]. He alleged that the College had declined to reappoint him to his probationary teaching position as a direct result of exercise of his constitutionally-protected right of freedom of expression and that he had been denied administrative procedures due him under Article 7 of Title 5 of the California Administrative Code.[1] The district court granted summary judgment for Mabey on both claims and the College has appealed.[2]

Mabey was first appointed as a probationary academic employee in the College's philosophy department for the 1968–69 year.[3] The College reappointed him for the next year. Both of these contracts were for one year. Mabey does not claim that he was *de facto* tenured.

On November 25, 1970, the President of the College informed Mabey by letter that his contract would not be renewed. The letter contained no explanation for the College's decision, but the appellants later advanced two reasons. To better understand the reasons, they must be seen against the background at the College in the Fall of 1970. The campus had become one of the battlegrounds of the political and academic conflicts of the middle and late 1960's. Civ-

---

denied their request for a preliminary injunction, while retaining jurisdiction over the substantive claims. (*Toney v. Reagan* (9th Cir. 1972) 467 F.2d 953, *aff'g* (N.D.Cal.1971) 326 F.Supp. 1093.) The pursuit of that process proved successful for four of the original six: two were reinstated following grievance procedures; a third was reinstated and granted tenure; a fourth was reappointed. The fifth person resumed teaching out of California. Only Mabey remains in litigation.

3. The probationary period before which a person is eligible for tenure is usually four years. (Calif.Admin.C., Title 5 §§ 42700(r), 43560(a).)

ility, even among faculty and administrators, was a major casualty, with apparently open hostility existing among the various factions. The acting president of the College was aligned with the "conservative" faction. On May 17, 1970, the *Los Angeles Times* published an interview with him in which he was quoted as calling some of the younger faculty "punks" and the ousted ombudsman a "jerk;" his executive vice president was quoted as calling the opposing faculty "damned liars." The next day, at an academic senate meeting, following a vote to amend the agenda to include a discussion of the *Times* article, Mabey took the floor to comment on the article. After the chairman of the senate ruled him out of order, Mabey engaged in a dialogue with him for a few minutes.[4] When a motion to adjourn was made, Mabey left and the meeting resumed. During his remarks he had referred to various people as "older punks," "jerks," and "damned liars." The appellants alleged neither that Mabey was violent, nor that there were students present. The College asserts that Mabey's unprofessional conduct at this meeting was one ground for his non-retention.

The College urges that a second, independent reason for not reappointing Mabey was the "overstaffed" condition of the philosophy department. The university arrives at the number of faculty each department is entitled to by a complicated formula that compares the number of full-time equivalent students to the student-faculty ratio, established on the basis of available funds. Appellants have alleged that during the

4. (C.T. 193, 473). The transcript of the exchange reads as follows:

ROUSECK: All those in favor of a change of agenda raise your right hand. Thirty-five. All those opposed. The motion carries. Dr. Dutton.

DUTTON: It seems to me that it would be appropriate . . . a discussion of the L.A. Times . . . "jerks" and "punks" and things like that . . .

MABEY: The members of this body . .

ROUSECK: You're out of order. You don't have the floor. Would you please take your seat. You don't have the floor. Sit down in your seat.

MABEY: I am. I am sitting down. Alright I'm sitting down. How's that?

ROUSECK: Now would you like to ask for the floor?

MABEY: No. I've got the floor, thank you. I'd like to know on what grounds you made the kinds of charges you did against the Experimental College in the L.A. Times.

ROUSECK: Sit down. You're out of order. This is not a discussion time right now.

MABEY: You're out of order. This whole college is out of order.

ROUSECK: If you'll sit down so that this body can proceed in an orderly way . . .

MABEY: There isn't an orderly way for this body to proceed. This body doesn't do anything.

ROUSECK: If you'll sit down . . .

MABEY: You sit around here and let that guy push you around and do what he wants.

ROUSECK: You're out of order. Will you sit down.

MABEY: You're out of order, this whole place is out of order. This college is run by a jerk. And you're a damned liar and . . .

ROUSECK: If you'll please sit down or may I have you removed forcefully.

MABEY: The College is run by a lot of older punks.

ROUSECK: Would you please sit down so this body can proceed?

MABEY: You people sit around here. You let this guy violate consultative procedures, you let him make public statements, charges against the faculty . . .

ROUSECK: What does the body wish to do about these irrational statements?

MABEY: Listen. I'm not making irrational statements . . .

ROUSECK: There's been a motion to adjourn. Is there a second?

MABEY: Adjourn. You never do anything anyway.

ROUSECK: All those in favor of adjourning raise your right hand.

MABEY: It's a phony thing, a phony thing, and you know it . . .

ROUSECK: All those opposed . . .

MABEY: This isn't a government it's a rubber stamp . . .

ROUSECK: All right let's have a count. The motion has been made to adjourn. Those in favor of adjourning raise your right hand.

MABEY: See you next year . . . I feel sorry for you guys . . . (exit)

ROUSECK: All those in favor of adjourning raise your right hand. Alright we won't adjourn. Next item on the agenda is the communications and announcement.

After the exchange Mabey exited the meeting and the agenda was completed.

1970–72 period Mabey's department employed three to five more faculty than its enrollment warranted. Nevertheless, in the Fall of 1970, the department and its chairman recommended that Mabey be reappointed, and also recommended approval of his application for a leave of absence without pay to complete his doctoral thesis. Allegedly because of the overstaffing problem, the Dean of the School of Humanities (and the Acting Academic Vice President) recommended against both retention and granting the leave. The president adopted the Dean's advice, and notified Mabey of his decision not to reappoint him.

Mabey brought this civil rights action in January 1971. Pursuant to an order of the district court, he appealed his non-retention to the College's grievance committee which decided, in June 1971, that the president's decision had not been arbitrary and had not deviated from established procedures. The University Chancellor's Office likewise rejected his appeal. The district court had retained jurisdiction over the substantive aspects of Mabey's complaint, and in April 1973, Mabey moved for summary judgment and a permanent injunction. The College opposed the summary judgment and submitted affidavits to show that material factual issues existed. It also moved to dismiss the complaint. On April 12, 1974, the district court issued a Memorandum of Decision which treated the summary judgment motion and the opposition to it as cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, because affidavits had been submitted. It held that Mabey's speech at the academic senate meeting was protected and that non-retentions for overstaffing must follow the procedures of Article 7 of Title 5 of the California Administrative Code.[5] The dis-

trict judge recognized that there were genuine issues of material fact as to "the true and actual reason or reasons for [appellants'] decision not to retain Mabey," and their compliance with Article 7. He therefore referred the case to a special master to "assembl[e] and summariz[e]" the evidence on these two issues. (N.D.Cal. Local Rule 505; F.R.Civ.P. 53(b).) Following the master's report, in September 1974, the district court held that the non-retention was "in whole or in part in retaliation for [Mabey's] exercise of his constitutionally protected freedom of expression" and that appellants had failed to comply with Article 7. The court awarded him reinstatement and back pay.

■ Appellants raise four issues before this court. They assert that the posture of the case as of April 12, 1974, did not permit the district court to resolve all the disputed fact issues; therefore, summary judgment was improperly granted on both the First Amendment and due process questions. Next they say that even if summary judgment was appropriate, the record shows that Mabey's conduct at the meeting was not protected. Finally they say that the district court was wrong in its interpretation of Article 7; since the conduct ground was independent of the overstaffing ground, the latter sufficed.[6]

■ This case presents both non-constitutional and constitutional issues. When a non-constitutional ground will dispose of a case, it is our obligation to use it. Here, if Article 7 procedures apply, a dispositive non-constitutional issue is presented. Since we conclude that Article 7 was inapplicable, it is necessary to treat the First Amendment claim. Before doing so, we discuss mixed-motive terminations, where one factor is constitutionally protected and a

---

5. The court rejected appellants' arguments that it should abstain and that laches barred the complaint. Appellants do not appeal these points.

6. Mabey argues that appellants' failure to notice their appeal within 30 days of the April 12, 1974 Memorandum (F.R.App.P. 4) forecloses them from appealing the issues decided in that Memorandum. However, until the September

11, 1974 order there was no "final decision" adjudicating the rights of the parties. (28 U.S.C. § 1291.) The court had not granted Mabey any relief and no collateral issues were decided. Appellants' time did not start to run until entry of the September 11, 1974 order, and their appeal, notice of which was filed October 1, 1974, was timely.

second, independent factor is not. Finally, we confront the free expression issues and discuss the standard governing expressive conduct in quasi-academic environments.

### 1. ADMINISTRATIVE DUE PROCESS CLAIM

█ As an untenured instructor, Mabey had no constitutional right to notice and a hearing in respect to his non-retention. (*Board of Regents v. Roth* (1972) 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.) However, if the College's own rules dictated that certain procedures had to be used when an untenured instructor was not reappointed, it was bound to follow them. (*Yellin v. United States* (1963) 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778; *Vitarelli v. Seaton* (1959) 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; *Service v. Dulles* (1957) 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403; *Amluxen v. Regents of the University of California* (1st Dist. 1975) 53 Cal.App.3d 27, 36, 125 Cal.Rptr. 497, 502.) Mabey claims that Article 7 of Title 5 of the California Code of Administrative Procedure covers his case. Article 7 contains procedures to be used when employees of the state colleges and universities are laid off "for lack of work or lack of funds." Appellants do not dispute that they did not use these procedures when they chose not to retain Mabey because his department was overstaffed. They argue instead that the "lack of work or lack of funds" does not include overstaffing. According to them, Article 7 applies in emergency situations when substantial numbers of employees must be laid off in an impersonal way. Non-retention is, in contrast, an individualized decision dependent on a number of factors, a decision made deliberately and normally in the course of meeting personnel requirements. The district judge agreed with Mabey that Article 7 applied and granted summary judgment on this issue. Relying on appellants' responses to Mabey's interrogatories and requests to admit, and the special master's report, he found that Article 7 had not been complied with.[7]

Subchapter 6 of Title 5 deals with employees of the California State Colleges. The first section of Subchapter 6 is definitional (§ 42700). Subsections 42700(q) and 42700(s) respectively define "tenure" and "probationary employee." The tenured employee is permanent; a probationary employee is hired for terms of one year. "Temporary employees" are defined implicitly; they may be hired for less than one year (§§ 42700(j), 42703(b)).

Three Articles within Subchapter 6 specify circumstances under which employees can lose their jobs. A distinct procedure attends each circumstance. Article 11 on "disciplinary actions" regulates dismissals for cause. Employees dismissed for cause must be given notice and have access to a grievance committee. (§ 43525.) Cause is defined by the Education Code (Cal.Educ.C. § 24306) which also specifies in some detail the procedural safeguards surrounding a dismissal for cause. (Cal.Educ.C. §§ 24308–09.)

Article 7, as stated, deals with separations for lack of work or lack of funds. Rather than specifying procedures, the Education Code grants the trustees authority to adopt regulations governing these separations. (Cal.Educ.C. § 24312.) They have done so and in contrast to cause or non-retention decisions, this process is not at all individualized. The Chancellor of the system decides what "classes or teaching service areas" within each school are to be "reduced and the number of employees therein to be laid off . . . ." (§ 43200.) The employees are then laid off in an order specified by the Code: first temporary, then probationary, and finally permanent, the last in reverse order of seniority. Within the probationary and temporary groups, the Chancellor and president have discretion to chose from among those in the same class. (§ 43202(a)(1), (c).)

---

7. Since we find that Article 7 is inapplicable, we do not need to consider the appropriateness of granting summary judgment.

Article 13 treats the tenure rights of academic employees, including some aspects of non-reappointment of untenured faculty. Like the layoff regulations, the regulations dealing with decisions not to reappoint are within the broad discretion of the trustees. (Cal.Educ.C. § 24305.) Within Article 13 section 43566 governs the "determination not to reappoint" a probationary employee, specifying when notice of the non-retention decision must be given, and that it must be written. This section refers to section 42701, which establishes a consultative procedure for "academic personnel matters," including retention. In accordance with this section, the tenured faculty make recommendations on "academic personnel matters." Section 42702(a) says "[a]ll appointments" will be made "solely on ability and fitness for the position to be filled," while section 42702(d)(1) gives the president the authority to make all academic appointments "which do not involve promotion or tenure."

The foregoing makes it clear that the non-retention decisions differ significantly from the layoff decisions. The latter procedure gives the president or Chancellor only limited discretion with respect to individuals, while the former gives them almost complete discretion. The College gave "overstaffing" as a reason for not retaining Mabey. The question is whether overstaffing within one department is a valid predicate for an Article 13 decision, or whether it necessarily falls within Article 7.

■ Article 7 is addressed to separations for "lack of work or lack of funds." Other than cause, "lack of work or lack of funds" is the only reason tenured faculty can be separated. Thus the phrase is akin to the more generally used "demonstrable financial exigency." (*See, e. g.,* American Association of University Professors, Statement of Principles on Academic Freedom and Tenure (1940).) Financial exigency has been described as "imminent financial crisis which threatens the survival of the institution as a whole and which cannot be alleviated by less drastic means" than "[t]ermination of an appointment with continuous ten-

ure, or of a probationary . . . appointment before the end of a specified term." (AAUP, Termination of Faculty Appointments Because of Financial Exigency, Discontinuance of a Program or Department, or Medical Reasons (rev. 1975).) While this description is not binding upon us, it is useful. Article 7's procedures reinforce the emergency tone. People are laid off in groups, by seniority, rather than on an individualized basis in a manner responsive to academic needs. Only 30 days' notice must proceed an Article 7 separation. Finally, Article 7 contains procedures for rehiring faculty, implying that the separation is envisioned to be temporary.

An overstaffed condition in one department need not approach, in severity, a state of financial exigency. During the period Mabey taught at the College, there were approximately 800 faculty. That one department had one or a few more professors than its course enrollment demanded, did not "threaten the survival of the institution as a whole." Therefore, even if a reduction in the overall number of faculty was called for, that was not necessarily equivalent to the large scale reduction in staff that is the subject of Article 7.

Unlike Article 7, Article 13 does not convey a sense of crisis: non-retained faculty must be notified several months prior to the end of their current employment year and there is no mechanism for mid-year terminations. Article 13, by reference to section 42701, integrates the faculty into retention decisions, while the president retains ultimate authority, thereby establishing a consultative framework for considering not only the needs of the instructor's department, but also the more generalized needs of the university: the overall instructional mission, the mix of specializations among the faculty, the growth or decline in attendance of various courses. Overstaffing within a particular department naturally affects the non-retention decision. A college has limited funds and must elect to spend them in an optimal way. Allocating those funds encompasses decisions not to reappoint pro-

bationary faculty, even if they are well qualified.[8]

■ It is possible, of course, for a college to abuse Article 13-type procedures. A school that is chronically overstaffed, as the College was in the early 1970's, can use non-retention as a means of ridding itself of unwanted faculty. However, the judicial reaction should not be to foreclose the non-retention option when overstaffing is a legitimate reason. Rather, it should be to scrutinize the decision carefully to see that, for example, First Amendment concerns receive appropriate attention and that there really is an overstaffed condition.

In the present case, the district court made no finding as to whether overstaffing existed in the philosophy department. On remand, the court will determine whether the philosophy department was overstaffed.

## 2. MIXED–MOTIVE TERMINATIONS

■ The existence of a constitutionally permissible ground for not reappointing a faculty member does not end our inquiry when a second basis is alleged to be impermissible. We have recently stated that:

"[a] decision to terminate employment of a teacher which is only *partially* in retaliation for the exercise of a constitutional right is unlawful." (*Gray v. Union County Intermediate Education District* (9th Cir. 1975) 520 F.2d 803.) (emphasis in original.)

In *Gray,* however, the behavior was held to be unprotected, and this Circuit had not previously formulated a rule for treating terminations resting partly on an impermissible ground. (*See Starsky v. Williams* (9th Cir. 1975) 512 F.2d 109, 111.)[9]

In all but the clearest cases, the decision to terminate a probationary teacher's employment entails the complicated weighing of many factors, almost all of which are subjective. An essential element of the probationary process is periodic assessment of the teacher's performance, including the person's ability and willingness to work effectively with his colleagues. Moreover,

"it is reasonable that there be available a very wide spectrum of reasons, some subtle and difficult to articulate and to demonstrate, for deciding not to retain a newcomer or one who has not yet won sufficient respect from his colleagues." (*Roth v. Board of Regents* (W.D.Wis.1970) 310 F.Supp. 972, 978–79.)

Although final decision-making authority may rest in one individual, generally many people contribute to the evaluation process. Even neglecting personal jealousy and prejudice, we suspect that the systems of weights each person assigns to various factors are incommensurable; there is probably no consistent ordinal ranking, much less a cardinal one. Thus, there is no precisely

---

8. The district judge held that Article 7 procedures were applicable. He relied on Article 7's policy of avoiding unnecessary "reductions in staff" and the use of "reduce" three times in § 43200. This interpretation focuses too narrowly on the literal language of § 43200. Any decision to drop a faculty member will reduce the size of the staff. This is as true of dismissals for cause, as it is non-retention.

Recently a California court construed Article 7 as appellants would have this court construe it. (*Andreadis v. Trustees of the Calif. State Univ. and Colleges,* Cal.App.3d, 130 Cal.Rptr. 652 (1st Dist. 1976).) (Alameda County Super.Ct. 1974) *appeal pending* (1st Dist. 1st Div.)) That case does not resolve the issue for this court. It does, however, lend support to our views.

9. In the present case, we do not need to look behind the stated permissible reasons for dissatisfaction to try to discern a motive based on

exercise of First Amendment rights. (*E. g., Robison v. Wichita Falls & N. Tex. Comm. Action Corp.* (5th Cir. 1975) 507 F.2d 245; *Cook County College Teachers Union v. Byrd* (7th Cir. 1972) 456 F.2d 882; *Fluker v. Alabama State Bd. of Educ.* (5th Cir. 1971) 441 F.2d 201; *Johnson v. Branch* (4th Cir. 1964) 364 F.2d 177 (*en banc*).) Here at least one of the stated reasons for dismissal is arguably eligible for First Amendment protection. (*See also Bertot v. School Dist. No. 1, Albany County, Wyoming* (10th Cir. 1975) 522 F.2d 1171, 1182–83; *Gray v. Union County Intermediate Educ. Dist.* (9th Cir. 1975) 520 F.2d 803; *Smith v. Losee* (10th Cir. 1973) 485 F.2d 334 (*en banc*); *Gieringer v. Center Sch. Dist. No. 58* (8th Cir. 1973) 477 F.2d 1164; *Duke v. North Texas State Univ.* (5th Cir. 1972) 469 F.2d 829; *Russo v. Central Sch. Dist. No. 1* (2d Cir. 1972) 469 F.2d 623.)

calibrated scale whose pointer indicates when an instructor's negative qualities outweigh his positive ones. There is a more or less broad grey area, in which we permit official discretion to operate and decide.

■ Withal, it is our duty to protect First Amendment values. Initially, our concern is to guard the rights of the terminated instructor. But, more importantly, we examine alleged First Amendment violations because of their potential chill on others, especially those situated like the complainant. Although a person's tenure status is irrelevant to the First Amendment inquiry (*Perry v. Sindermann* (1972) 408 U.S. 593, 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570), our close examination is particularly appropriate where, as here, a complex of reasons may as well mask an unlawful motive as legitimately motivate a refusal to rehire, and where all of those in the group are subject to the threat of loss of their jobs for identical ill-defined reasons.

The potential for subterfuge exacerbates our dilemma. On the one hand, our reluctance to intrude deeply into the administrative process may permit an ill-motivated decision-maker spuriously to cite apparently legitimate grounds for non-retention. On the other hand, solicitude for First Amendment rights, and the need for prophylactic rules to prevent encroachments on them, may aid an incompetent or otherwise undesirable employee. (*See Robison v. Wichita Falls and North Texas Community Action Corp.* (5th Cir. 1975) 507 F.2d 245, 256; *Russo v. Central School District No. 1* (2d Cir. 1972) 469 F.2d 623, 633.)

■ Although motivational analyses can be slippery, the only way to erect adequate barriers around First Amendment freedoms is for the trier of the fact to delve into the motives of the decision-maker. As in *Gray, supra,* we emphasize that the trier must be alert to retaliatory terminations. (*See also Simard v. Board of Education* (2d Cir. 1972) 473 F.2d 988, 995 (*dictum*); *Fluker v. Alabama State Board of Education* (5th Cir. 1971) 441 F.2d 201, 210 (*dictum*).) The *Gray* test is not a balancing test. Whenever the state terminates employment to quell legitimate dissent or punishes protected expressive behavior, the termination is unlawful. Other courts have stressed the pretextual nature of the unprotected bases as a theory for invalidating the non-retention. (*Bertot v. School District No. 1* (10th Cir. 1975) 522 F.2d 1171; *Smith v. Losee* (10th Cir. 1973) 485 F.2d 334 (*en banc*); *Johnson v. Branch* (4th Cir. 1964) 364 F.2d 177 (*en banc*); cf. *Cook County College Teachers Union v. Byrd* (7th Cir. 1972) 456 F.2d 882.) We agree, although we view the triviality of other asserted reasons, or discriminatory application of rules, as evidence that the true moving factors lay elsewhere, rather than as merely diminishing the weight on one side of a balance.

■ We stress that this holding does not shield those who are legitimately not reappointed. Where the complainant can point to no "discriminatory enforcement of standards" (*Robison v. Wichita Falls and North Texas Community Action Corp., supra,* 507 F.2d at 255), or where the complainant does not meet his burden of proof that the state acted to suppress free expression (*Simard, supra; Fluker, supra*), the termination will stand.

■ Since questions of motive predominate in the inquiry about how big a role the protected behavior played in the decision, summary judgment will usually not be appropriate. (6 J. Moore & J. Lucas, Moore's Federal Practice, ¶ 56.17[41.–1] (1976).)

## 3. FIRST AMENDMENT CLAIM

■ Mabey's outburst was comprised of closely intertwined conduct and speech. Although it might be possible to take an analytical scalpel to the scene at the academic senate meeting and pare the conduct away from the speech, such carving is neither very convincing (*see, e. g.,* Nimmer, "The Meaning of Symbolic Speech Under The First Amendment," 21 U.C.L.A.L.Rev. 29, 33 (1973)), nor demanded by the First Amendment. That Amendment protects the "expression of idea[s]," even "through activity." (*Spence v. Washington* (1974) 418 U.S. 405, 411, 94 S.Ct. 2727, 41 L.Ed.2d

842.) The protection extends both to activity that is relatively passive or symbolic (*e. g. Spence v. Washington, supra* (use of American flag to protest war); *Brown v. Louisiana* (1966) 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (sit-in demonstration)) and to more active demonstrations. (*Doran v. Salem Inn, Inc.* (1975) 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (nude dancing may "be entitled to First and Fourteenth Amendment protection under some circumstances"); *cf. Cox v. Louisiana* (1965) 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (civil rights picketing).)

The behavior at issue here was not symbolic speech in the usual sense. (*E. g. Spence v. Washington, supra*; *Cohen v. California* (1971) 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284; *United States v. O'Brian* (1968) 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672.) It had a vocal and unmistakably "speech" element embedded in a matrix of movement, interruption of the proceedings and refusal to bow to authority. Although the cognitive content of Mabey's act may be severed from the movement, much of the impact of his expression lies in its emotive content, which is not severable from his mode of expression. We thus consider the totality of Mabey's behavior.[10]

Conduct of various kinds in schools and universities has long been a subject for First Amendment protection. (*Healy v. James* (1971) 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266; *Tinker v. Des Moines Independent Community School District* (1969) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; *West Virginia State Board of Education v. Barnett* (1943) 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628; *Russo v. Central School District No. 1* (2d Cir. 1972) 469 F.2d 623; *James v. Board of Education* (2d Cir. 1972) 461 F.2d 566; *cf. Grayned v. City of Rockford* (1972) 408 U.S. 104, 116–18, 92 S.Ct. 2294, 33 L.Ed.2d 222.) The problem has been to mark out the boundaries of protec-

tion, keeping in mind the specialized needs of the academic environment. This surveying task has been complicated because many early cases in the school setting were at pains to establish that the school administrators could not forbid expression that appears tame to the point of innocuousness. Courts often considered more dramatic expression in the context of criminal regulations, but in deciding when a college can refuse to reappoint probationary instructors, the question is different from that posed in the context of state imposition of criminal sanctions. (*E. g. United States v. O'Brian, supra.*)

Both sides in the present case rely on the test given by *Pickering v. Board of Education* (1968) 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. Pickering was a high school teacher who wrote a letter to a local newspaper criticizing certain action by the board of education in the locality in which he worked. They fired him. The Supreme Court balanced Pickering's interests as a citizen to speak out on matters of public concern against what it saw as the school board's interests. It noted that

"[t]he statements [were] in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." (*Id.* at 569–70, 88 S.Ct. at 1735.)

The *Pickering* Court never intimated that its list of state interests was exhaustive,[11] nor that they could be transfer-

---

10. This is not to say that where a university expressly acts against the *content* of speech, the surrounding activity must be taken into account. (*E. g., Papish v. Board of Curators* (1973) 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618; *Adamian v. Board of Regents* (9th Cir. 1975) 523 F.2d 929, 933.)

11. The Court also considered the effect of statements it thought were false. Under this heading it put damage "[to] the professional reputations of the Board and the superintendent and fomenting controversy and conflict among the Board, teachers, administrators and the residents of the district." (391 U.S. at 570,

red without change from the high school to the college environment. A college relies in large measure on faculty self-governance and its contributions to administrative decisions. This is analogous to, but different from a high school's need for "discipline by . . . . superiors." Although attenuated, an attack on those processes attacks the educational process as well. The college also has an interest in the free speech rights of the faculty. (Ely, "Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis," 88 Harv.L.Rev. 1482, 1499 (1975).) Open channels of communications are necessary for scholarly research, for teaching, and for the self-governing system.

*Pickering* did not establish the limits of a teacher's right to exercise First Amendment rights within the school. *Tinker v. Des Moines Independent Community School District, supra,* in the course of reversing the suspension of high school students for wearing black armbands protesting the Viet Nam war, promulgated a verbal formulation of the limits of in-school conduct of students. (*See* Note, "Teachers' Freedom of Expression Outside the Classroom: An Analysis and Application of *Pickering* and *Tinker*," 8 Ga.L.Rev. 900 (1974).) Mr. Justice Fortas wrote for the Court:

"It [the demonstration] does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct primary First Amendment rights akin to 'pure speech.'

"The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the school's work or of collision with the rights of other students to be secure and to be let alone.

Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students."

\* \* \* \* \* \*

"The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken in class, in the lunchroom or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 94 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

"In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. *Burnside v. Byars, supra,* [363 F.2d 744], at 749." (393 U.S. at 508–09, 89 S.Ct. at 738.)

88 S.Ct. at 1736.) It was also concerned lest false statements have "any . . . impact on the actual operation of the schools, beyond its tendency to anger the Board." (391 U.S. at 571, 88 S.Ct. at 1736.) In the present case there is no claim by appellants that Mabey's

accusations were false, so the above interests are not implied in the balance. Clearly, relevant true statements that damage reputations or foment controversy are immune from attack.

The *Tinker* Court emphasized that there had been no substantial disruption of the school system's disciplinary processes. Only a few of the 18,000 students in the system had been involved at all. There had been some intramural name-calling, but that was minor. The officials were more concerned with anticipated responses than with actual reactions. There is an implication in *Tinker* that the "disruption" rationale was the school's post hoc attempt to explain a regulation that was really directed at the "principle of the demonstration" (393 U.S. at 509 n. 3, 89 S.Ct. 733) and thus forbidden by the First Amendment. (*See also Bertot v. School District No. 1, supra,* at 1182–83.)

The present case differs in two respects from *Tinker*. First, the setting was a college, not a high school. *Tinker* emphasized "appropriate discipline." We doubt that discipline is the operative concept in a college, but some degree of coherence is necessary for the proper functioning of the institution. In a similar vein, *Pickering's* criteria included harmony between and among faculty and administrators. This sort of harmony is not peculiar to academic institutions. Any collective activity requires at least some mutual regard to fulfill its missions. The level of respect depends on the degree of interdependence among the participants. In a college, that interdependence may be less than in a high school. A concern present in a college, but absent in high schools is that usually colleges have a research goal as well as a purely instructional one. Substantial interference with scholarly research may also be proscribed.

 The second difference is that the alleged First Amendment restraint was applied to a teacher, rather than to a student. There may be situations where a teacher's right to free expression is subject to greater constraints than a student's (*see, James v. Board of Education, supra,* 461 F.2d at 573), for example, where the teacher's in-class behavior is at issue. (*E. g., Birdwell v. Hazelwood School District* (8th Cir. 1974) 491 F.2d 490; *Whitsel v. Southeast Local School District* (6th Cir. 1973) 484 F.2d 1222.) We need not consider that point. Mabey, like Pickering, was not acting in a strictly academic capacity. Students did not participate in the meeting, presumably because the faculty could be more candid in their absence.[12] In *Adamian v. Board of Regents* (9th Cir. 1975) 523 F.2d 929, we acknowledged that complete serenity does not obtain in all aspects of academic life; the academic senate is one place where expression of opinions should be most unfettered. We observed:

> "Self-restraint and respect for all shades of opinions, however desirable and necessary in strictly scholarly writing and discussion, cannot be demanded on pain of dismissal once the professor crosses the concededly fine line from academic instruction as a teacher to political agitation as a citizen—even on the campus itself." (Id. at 934.)

Despite its name, the senate was simply the representative body of the academic employees of the College. We have no reason to think that tempers will not occasionally flare at such meetings.

The contested behavior in *Tinker* was almost *de minimus* ; it was passive and relatively innocuous. Therefore, it supplies only a starting point. Subsequent cases have explored the other extreme of the conduct spectrum. Two recent cases in this Circuit shed some light on how far a faculty member can go in speaking out before he or she walks beyond the First Amendment's umbrella.

12. *Gray, supra* note 9, quite clearly involves student welfare; Gray attempted to influence a key decision in her student's life. Insofar as Adamian's acts lead to students' violently demonstrating or confronting other students, his behavior also impinged on student welfare. (*Compare Russo v. Central School Dist. No. 1, supra,* (teacher not saluting flag did not interfere with school's conceded right to inculcate patriotic values where other teacher did lead students in salute).) This key factor distinguishes Mabey's case from *Duke v. North Texas State University* (5th Cir. 1973) 469 F.2d 829, and *Skehan v. Board of Trustees* (M.D.Pa. 1973) 358 F.Supp. 430 *rev'd on other grounds,* (3d Cir. 1974) 501 F.2d 31, 39, 45, *vacated on other grounds* (1975) 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474, where the accused instructor's conduct affected students or prospective students.

In *Gray v. Union County Intermediate Education District, supra,* the plaintiff, a teacher, was terminated when she "interfered with the judgment of the Department of Welfare" as to whether one of her students should have an abortion. (520 F.2d at 806–07.) Gray engaged in a campaign against the Department to get the young woman an abortion, contacting the psychiatrist involved in the case, the judge overseeing the woman's custody, her case worker, various attorneys, the young woman's relatives, and eventually, against the Department's wishes, the young woman herself. The district court found that her activities so interfered with the relationship between the Welfare Department and the Education District that it went beyond the bounds of First Amendment protection. We agreed and affirmed.

In *Adamian v. Jacobsen* (9th Cir. 1975) 523 F.2d 929, this court had before it the case of a tenured professor who had tried to disrupt a ceremony at the University of Nevada at Reno.

"[T]he Board of Regents . . . had given [the demonstrators] permission to march three times around the stadium track. The protest went beyond this march, however, Adamian (yelling, 'Let's stop this mother—') and others tried to stop a motorcade bringing officials for the ceremonies into the stadium; led by Adamian the demonstrators then made loud noises to disrupt the ceremonies. Still later, Adamian left the stands, joined a group on the field and motioned other demonstrators onto the field, thus creating a danger of violent confrontation between two bodies of people." (Id. at 931.)

The Regents directed that charges be brought against Adamian. The academic senate obeyed and found that Adamian had violated the University Code by failing to "exercise appropriate restraint," and failing to show "respect for the opinions of others." They found that this transgression provided "adequate cause" for Adamian's dismissal. He challenged the decision on the basis of vagueness and overbreadth in the Code's language and won a partial summary judgment in the district court. The language was "adopted almost verbatim" from AAUP Statement on Academic Freedom, *supra.* We held that if the University's understanding of its code provision was the same as the interpretation given by the American Association of University Professors, which severely limited the general wording, the language was not overbroad, and remanded.

*Gray* and *Adamian* focus on a series of acts which created significant disturbance, either at one event or with respect to an important relationship between the school system and another organization. In neither case did the act appear to be spontaneous. Gray engaged in a planned course of conduct over an extended period; Adamian allowed his cohorts to regroup and "attacked" again. Both cases exhibit either premeditated disruption or a long-standing lack of concern about potential disruption. This is not to say that one act, sufficiently egregious, may not sink to the unprotected level. Rather, the cases imply that an isolated impassioned statement is unlikely to create sufficient disruption to meet the "material and substantial" test of *Tinker.* (*Puentes v. Board of Education* (1969) 24 N.Y.2d 996, 302 N.Y.S.2d 824, 250 N.E.2d 232.)

Another factor, implicit in *Adamian, supra,* is the presence of violence or an incitement to violence. (*See also Starsky v. Williams* (D.Ariz.1972) 353 F.Supp. 900, aff'd (9th Cir. 1975) 512 F.2d 109.) Teaching and scholarly research can thrive only in an environment with at least a minimum of stability and calm. At some point conduct can become sufficiently violent to cause a breakdown of these necessary conditions, but *de minimis* interference does not mark that point. Mr. Justice Fortas in *Tinker,* for example, stressed that only a very few of the students wore armbands and that the only counter-demonstrations they provoked was some name-calling.

 *Pickering* directs that the court balance the various negative factors against the complainant's interest in free expres-

sion. *Tinker* and its progeny teach that the court must focus on actual, not potential or hypothetical, disruption. We have no doubt that the proper functioning of schools and universities requires some discretion from all involved, but unrealistic sensitivity to the fragility of schools and universities is inappropriate. Robust intellectual and political discussions can and should thrive on college campuses. These discussions will not always be models of decorum. Moreover, often those with the power to appoint will be on one side of a controversial issue and may find it convenient to use their opponents' momentary stridency as a pretext to squelch them. The court must closely examine the asserted disturbing activity to insure that the reasons advanced meet the "substantial and material" disruption standard. (*See Los Angeles Teachers Union v. Los Angeles City Board of Education* (1969) 71 Cal.2d 551, 78 Cal.Rptr. 723, 455 P.2d 827.)

 Summary disposition is generally inapposite for constitutional questions. (6 J. Moore & P. Lucas, Moore's Federal Practice, ¶ 56.17[10] (1976).) In the present case, the district judge had to decide that there was no material fact issue as to the level of disruption Mabey caused. The record upon which the district judge granted summary judgment less than totally illuminated Mabey's conduct and its impact. Mabey's complaint quoted the transcript of his words at the meeting. The appellants' motion to dismiss referred to Mabey's quotation and relied on it. Otherwise, there is very little evidence about the incident. Of the six affidavits appellants submitted, only Keene's refers to unprofessional behavior, and it merely states that such conduct would be a valid reason for not retaining a probationary professor. The grievance hearing transcript contained descriptions of

the meeting, but the court could not use the uncertified transcript as evidence.

In assessing the disruptiveness of Mabey's behavior, the district court had to take account both of Mabey's effect on the meeting itself and his subsequent relations with the College's administration and those faculty with whom Mabey had to work closely.

Mabey, at least momentarily, did disrupt the senate meeting. The question is the severity of the disruption. The senate presumably considered problems of the academic community and this particular community was already embroiled in a high level of strife. The previous day the president of the College had been quoted as making derogatory remarks about his opponents. The matter was of substantial current importance to others at the meeting; Mabey was only following Dr. Dutton's lead by bringing it up. He spoke angrily, but he did not use obscenity. Sarcasm seems to have been his main weapon; he tried to turn the epithets of the article against its supporters. Even drawing all inferences favorable to the appellants, we cannot say that Mabey tried to disrupt the meeting; when it became clear he would not be permitted to speak out of order, he left and the meeting continued.

There was no evidence at the time of the summary judgment that Mabey either used or incited violence. We recognize that violence means different things in a library than it does on a football field, but his tone, although biting and insulting, does not appear to pass into the realm of violence. We note that the grievance hearing transcript provides little or no additional ammunition for the violence charge.[13]

*Pickering* emphasized disharmony between the instructor and those with whom he is in daily contact. Mabey undoubtedly

---

13. The only mention of violence was by Dr. Fulkerson, a witness for the College, who said:
"Well, I'd characterize it as rather unusual. He was rather openly outspoken in the sense that he making [sic] some inflammatory statements regarding members of the Senate, perhaps the Senate as a whole. He was asked, at least once, not to make the comments or abide by the Senate rules. He continued and got very excited. *He slammed down a chair or moved a chair or something.* He was angry regarding what he considered as an action of the Senate." (Emphasis added.)

antagonized and alienated some administrators and faculty. There was evidence, however, that this outburst did not hurt his relations with his closest colleagues, those in the philosophy department. Just six months after the incident, they recommended him for another year. There were no further outbursts, nor any violence. On the other hand, it may be that the incident so damaged his relations with senior administrators that his position would have been untenable. Without a closer look at the facts than the summary disposition has allowed, we cannot say whether this happened.

In sum, there remain material fact issues as to whether the philosophy department was overstaffed, and whether Mabey's speech was protected. We reverse the summary judgment and remand for a resolution of these issues consistent with the opinions herein expressed.