[No. A014999. Sixth Dist. Sept. 20, 1985.]

H. BRUCE FRANKLIN, Plaintiff and Appellant, v.
LELAND STANFORD JUNIOR UNIVERSITY et al.,
Defendants and Respondents.

324

## Counsel

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Edward M. Chen for Plaintiff and Appellant.

McCutchen, Doyle, Brown & Enersen, David M. Heilbron, Richard C. Brautigam and Jan Vetter for Defendants and Respondents.

## Opinion

**AGLIANO, J.**—This appeal by plaintiff H. Bruce Franklin challenges the judgment of the trial court upholding plaintiff's dismissal by his former employer, Leland Stanford Junior University (University). The underlying dispute dates back to a time of protest against the Vietnam war. More specifically, it concerns plaintiff's conduct on February 10, 1971. He was then, as he described himself, a leader of the local antiwar movement, his stature deriving partly from his tenured position as an associate professor of English. This action,[1] filed August 15, 1972, challenges his dismissal from that position.[2] Plaintiff's major contentions are that his conduct was protected by the First Amendment and the University regulations authorizing his discharge were unconstitutionally vague. We reject these contentions and the others discussed below.[3]

### Procedural History

On March 22, 1971, University President Lyman filed charges with the faculty advisory board of the academic council against plaintiff, alleging he had engaged in activities which constituted a "substantial and manifest neglect of duty and a substantial impairment of his performance of his appropriate functions" within the University in violation of the statement of policy on appointment and tenure at Stanford University and the Stanford policy on campus disruption.

The charges alleged four incidents:

1. On January 11, 1971, plaintiff participated in disruptive conduct which prevented Ambassador Henry Cabot Lodge from speaking at a public program at the University (Lodge incident).

2. On February 10, 1971, at a rally at White Memorial Plaza to discuss methods of protesting the Vietnam War, plaintiff intentionally "urged and

---

[1]The named defendants were the University, its president, Richard W. Lyman, its board of trustees, and its faculty advisory board.

[2]The University of Colorado refused to hire plaintiff following his dismissal from Stanford. Plaintiff challenged Colorado's refusal essentially raising the same issues he presents here. Judgment in that case was rendered in favor of the University of Colorado. (*Franklin v. Atkins* (D.Colo. 1976) 409 F.Supp. 439, (affd. (10th Cir. 1977) 562 F.2d 1188, cert. den. 435 U.S. 994 [56 L.Ed.2d 83, 98 S.Ct. 1645].)

[3]We do not here decide that First Amendment free speech principles apply to Stanford or any private institution. The faculty advisory board which recommended plaintiff's termination committed the University in this case to affording him the same constitutional protection as that available were he employed by a state school. For purposes of this appeal and the motions under review, Stanford has adopted the position that the outcome is the same whether it is viewed as a private or public employer. We thus review Stanford's action as if it were state action.

incited students and other[s] . . . to [disrupt University functions] and specifically to shut down a University computer facility known as the Computation Center'' (White Plaza speech).

3. Later on February 10, 1971, following disruption at the Computation Center, plaintiff significantly interfered with a police order to disperse by inciting those present to disobey it (Computation Center incident).

4. On the evening of February 10, 1971, at a rally in the Old Union Courtyard, plaintiff "intentionally urged and incited students and other persons to engage in conduct calculated to disrupt activities of the University . . . and which threatened injury to individuals and property'' (Old Union speech).

Upon plaintiff's request, a seven-member faculty advisory board evaluated the charges in accordance with the University's tenure agreement. Following 33 days of hearing in which 111 witnesses testified, the Board, on January 5, 1972, issued a detailed decision in which it (1) declined to sustain the charge regarding the Lodge incident; (2) unanimously sustained the charge regarding the White Plaza speech; (3) sustained the charges regarding the Computation Center incident and Old Union speeches by a 5-to-2 vote; and (4) by the same 5-to-2 vote recommended plaintiff's dismissal. President Lyman and the board of trustees of the University accepted the recommendation and discharged plaintiff effective August 31, 1972.

Plaintiff filed this action seeking reinstatement, declaratory relief, back-pay and damages.

On January 4, 1978, the trial court determined the University's standard for dismissal was not unconstitutionally vague and plaintiff's conduct during the White Plaza speech and the Computation Center incident was not constitutionally protected. However, the court did not sustain the charge relating to the "Old Union Speech." Since the trial court could not determine whether the University would have imposed the same penalty based on two of the three charges, on September 1, 1978, the case was remanded to the University for such determination.[4]

The faculty advisory board conducted further proceedings without redetermining the facts found by the 1972 board. On May 30, 1980, the advisory

---

[4]The trial court also determined the federal court decisions upholding the University of Colorado's refusal to hire plaintiff did not collaterally estop him here.

Without appealing from that portion of the judgment, defendants nevertheless contend the trial court erred in thus ruling. Defendants' apparent premise is that any trial court errors identified by plaintiff were not prejudicial. (See Code Civ. Proc., § 906.) We deem it unnecessary to address these contentions, as we find no such prejudicial error.

board unanimously recommended plaintiff's dismissal be reaffirmed. The board of trustees accepted the recommendation and reaffirmed plaintiff's dismissal on July 14, 1980.

The case returned to the trial court on November 18, 1980, for review. The court concluded the proceedings were proper, there was no abuse of discretion in the advisory board's determination that either of the two charges was serious enough to merit dismissal, and entered judgment in favor of defendants.

Plaintiff's timely appeal followed.

### The Scope of Appellate Review

█ Reviewing courts have repeatedly observed the obligation to independently evaluate the record in resolving First Amendment issues. (E.g., *Columbus Ed. Ass'n.* v. *Columbus City School Dist.* (6th Cir. 1980) 623 F.2d 1155, 1160; *Sussli* v. *City of San Mateo* (1981) 120 Cal.App.3d 1, 9 [173 Cal.Rptr. 781], cert. den. 454 U.S. 1085 [70 L.Ed.2d 621, 102 S.Ct. 643].) The United States Supreme Court has recently reiterated: "'This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." [Citation.] In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." [Citations.] We must "make an independent examination of the whole record," [citation], so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.' *New York Times Co.* v. *Sullivan,* 376 US 254, 285." (*NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 915-916 [73 L.Ed.2d 1215, 1238, 102 S.Ct. 3409]); *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 508-510, [80 L.Ed.2d 502, 521-523, 104 S.Ct. 1949, 1958-1960].)

When an employee has claimed to have been terminated for speech activity, appellate courts have independently reviewed the record to determine what expressive conduct was involved and whether it was protected. (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 578-579, fn. 2 [20 L.Ed.2d 811, 822-823, 88 S.Ct. 1731]; *Monsanto* v. *Quinn* (3d Cir. 1982)

674 F.2d 990, 996, fn. 10; *McMullen* v. *Carson* (11th Cir. 1985) 754 F.2d 936, 938; *Brasslett* v. *Cota* (1st Cir. 1985) 761 F.2d 827, 840.)[5]

Defendants' contention that we perform a traditional substantial evidence review is supported almost exclusively by license revocation cases which do not involve First Amendment claims. The one which does, *12319 Corp.* v. *Business License Com.* (1982) 137 Cal.App.3d 54 [186 Cal.Rptr. 726], reflects full awareness that First Amendment claims receive a different treatment. (*Id.*, at pp. 64-66.) We have independently reviewed the evidence, including transcripts of tape recordings of certain incidents.

### Facts

Both incidents occurred on February 10, 1971. The second ensued from the first, but both are set in a broader context. There was unrest at Stanford about the war in Indochina and the University's role in U.S. involvement. On January 11, 1971, a speech on campus by Ambassador Henry Cabot Lodge was disrupted. Proceedings by the Stanford Judicial Council against several students due to this disruption were in progress.

Several arson attempts and false alarms occurred on the evening of Saturday, February 6. The rumored invasion of Laos was officially confirmed on Sunday, February 7. That evening about 600 persons attended an antiwar benefit in Dinkelspiel Auditorium. Leaflets were circulated to the crowd, including one by an antiwar group called "The Inquisition" which described a war-simulation program by the Stanford Research Institute run at the school's Computation Center and advocated immediate end to war research at the center. The center was evacuated that evening due to a bomb threat. After the gathering at Dinkelspiel, about 100 windows were broken on campus, including windows on two University police cars when they trained spotlights on a group throwing rocks.

On Monday, February 8, a noon rally at White Memorial Plaza on campus was attended by about 800 persons. Then, about 150 persons blocked a

---

[5]When an employee has claimed that the true reasons for his or her discipline were retaliation for the exercise of free speech rights, California appellate courts have employed the substantial evidence standard of review. (*Adcock* v. *Board of Education* (1973) 10 Cal.3d 60, 66 [109 Cal.Rptr. 676, 513 P.2d 900]; *Ofsevit* v. *Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773 [148 Cal.Rptr. 1, 582 P.2d 88]; *Shimoyama* v. *Board of Education* (1981) 120 Cal.App.3d 517, 523-524 [174 Cal.Rptr. 748]; see *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575, 593 [100 Cal.Rptr. 16, 493 P.2d 480].) We take this question to be separate from the question of understanding the context of expressive conduct in order to determine whether it is protected and we independently review this latter question. We do not attempt to resolve any inconsistency between the federal and state rule regarding the standard of review on the former question. (See *Monsanto* v. *Quinn, supra,* 674 F.2d 990, 996; *McMullen* v. *Carson, supra,* 754 F.2d 936, 938.)

room in which members of the Stanford Board of Trustees were meeting. The group dispersed after the sheriff declared an unlawful assembly and deputy sheriffs arrived. Later that day the police dispersed two other assemblies and maintained a presence on campus that evening.

At 8 p.m., on Tuesday, February 9, a three-hour meeting in Dinkelspiel Auditorium was attended by about 800 persons. Plaintiff was present throughout the following events. An open discussion was guided by a chairman. Information was received regarding protest activities in other areas. Proposals were sought regarding positions to take and demands to make, and finally, proposals were sought for implementation.

Several written demands were announced. "The Inquisition" demand centered on publicizing and prohibiting use of the Computation Center and any other Stanford facilities for military research. Plaintiff spoke in response to a question concerning the connection between United States involvement in Indochina and local demands for action. His point was that multinational corporations represented by the Stanford Board of Trustees were the architects of a planned Pacific Basin empire of which the war was just a part. He called for discussion of that "consciousness," contending that if persuasive, then "we ought to take some very effective action here on the University" rather than only to lie down in front of military trains. Others then spoke to develop the connection as plaintiff had suggested. Three demands were approved by majority vote, namely: (1) the United States should get out of Southeast Asia, (2) all political prisoners should be freed, and (3) the University should end its participation in the war.

The discussion moved on to implementation of the demands. A speaker recommended shutting down the University by a strike. Another suggested a strike at the Computation Center because it was vulnerable to power loss. The first speaker responded that the Computation Center power supply need not be hit, but the workers could be stopped somehow. A majority favored a strike to include the Computation Center as a target. They then agreed on a plan of action, consisting of a noon rally the following day to initiate a roving strike to close down as many buildings as they could reach and an exploratory march to the Computation Center after that evening's meeting. Plaintiff joined the march to the Computation Center that evening.

On Wednesday, February 10, a noon rally at White Memorial Plaza was attended by about 700 people, including plaintiff. Some suggested that the antiwar protest should be directed at writing letters to Congress and generating community support. Others characterized these speakers as counterinsurgents. There were reminders that the purpose of the rally was to decide what to strike, not whether to strike. Nevertheless, other speakers continued

to make other proposals for action, such as sending money to the Pathet Lao or marching in protest the following day.

Plaintiff made what proved to be the last speech of the rally.[6] He concluded his speech by urging that the people take the action of shutting down

---

[6]The following are plaintiff's words: "People are complaining about the meeting going on a long time, so (cheers, laughter, applause) but, you know I think that we could inconvenience ourselves for a few minutes considering what we are trying to do here. Now, there were, there were some very, there were some hot emotions at the beginning of the meeting when Bob Grant and Larry Diamond tried to subvert what we were doing. And I think a lot of people misunderstood where things were and what was coming down, because they believed that they were very sincere people and so forth and either that we are some kind of lunatics who just have some private ax to grind, the we being the radicals, the revolutionaries.

"The fact of the matter is that though a lot of us were doing precinct work out in the community in 1964, and at that time we were opposed by the Bob Grants and Larry Diamonds of the world. We were called traitors and saboteurs of the war effort at that time. In 1965 the most radical act here was when 24 people stayed overnight in an all-night vigil at the fountain. Uh, people, people came down and beat us up and threw us into the fountain. In '60—in, late '65 or early '66, when we had here the first act in the United States of open identification, with the Vietnamese people, and it was a blood drive for North Vietnam, people threw garbage at us, called us dirty Jew-bastards and traitors and so forth. And, at every point, you see what, what I, when the movement was being built, there have been people who have come out to talk about the tactics alienating the vast mass of people and we who understand where that is coming from.

"Now they come out here and tell us that we shouldn't be doing anything on the university, we should be going into the community. We'd be the last ones in the world to oppose doing anything in the community. The fact of the matter is, that most of our comrades are working full-time in the community because they come from the community. And they're brown and black and white working-class and poor people.

"And, see, it's a very extreme form of false consciousness that's created on an university campus because we get the illusion because there are a lot of people gathered here that this is, this is the most advanced opposition, to the war. But that poll that was cited, it wasn't a poll of people who were in favor of the McGovern-Hatfield Amendment—they don't know what the fuck that is—but the poll that people want to get out of Southeast Asia right now. And that poll which is, and remember it was a poll of people over 21 and mostly white, but that poll showed something. And that is that 60% of those people with a college education wanted to get out of Southeast Asia now, 70% of people who only have a high school education want to get out of Southeast Asia now, and 80% of people with only a grade school education want to get out of Southeast Asia now. (Applause.)

"So when I talk about, about high consciousness, the high consciousness is the consciousness of the people most oppressed by U.S. imperialism, which includes as a main institution, like Stanford University. And that's why whenever people from that community, whenever poor, working-class youth from that community get a chance to come on campus at Stanford, and do a little material damage, they are very eager to do so. Because they recognize what Stanford University really is even if people here don't.

"Now, see, what the question is, the question of what to do, what do we do, now people get up here and talk about workers striking and the important thing is for us to go out to the community and tell the workers to strike. Well, that, it's true, that the workers have the ability in the long run to bring the war to an end, the war that started with the extermination of the Indian people, and black people, and Mexican people, and and went on the the point of where extermination of the people in Southeast Asia. Yes, it's working people who could do that, if they strike. But to ask us, for us to ask workers to risk their chance to survive, to physically survive, by really striking, when we can't do a kind of fake strike is to stand

the University Computation Center. Thereafter a vote was taken on whether to "put down" the Computation Center or the Hoover Institute, and the majority voted for the Computation Center.

Provost Miller was informed the demonstrators were converging on the Computation Center and shortly before 1 p.m., he ordered the building closed. Doors, windows, and gates were locked; handwritten notices were posted on the doors. Two campus police were stationed at the front door. The computer was kept running.

About 100 to 200 demonstrators arrived outside the center shortly after 1 p.m. A back door was forced open about 1:15 p.m. and a number of people entered through that door, opening other entrances as they occupied the building. At 1:20 p.m., power to the building and the computer was cut off by pulling a master switch near the back door. About 100 to 200 demonstrators occupied the building. Some forced open the doors of the machine room and wires were pulled out on one unit. About $800 of physical damage was done on the premises, disregarding the loss of computer time.

Plaintiff did not immediately join those he had exhorted. Instead, he went to his 1:15 class and since only 7 of the 150 registered students were present, he moved the class to the area outside the Computation Center, where he remained as an observer outside the center.

Bruce Wiggins, Stanford's Director of Public Safety, and C. D. Marron of the Santa Clara County Sheriff's office toured the occupied building. At about 3 p.m., they met with representatives of the University's administration and also Sergeant Tamm and Captain Rosa of the sheriff's office. Wig-

---

the world on its head. When, when we talk about (applause) see, we're just, we're just ripping off that term 'strike' when we talk about striking at Stanford. This isn't a strike. We're not risking anything. It's a voluntary boycott, a shut-down of some of the activities of the university as a demonstration of something.

"Now, now what we, we had, what we called a strike last year, it lasted really about three days and it kinda dragged on and, you know, in an odds and ends way. But just the fact that we were able to move our little finger that much, that electrified the working people of this area. That's a fact. And the people who were down there on that picket line down at shipping and receiving, know that practically every single truck driver who came there when he saw us on strike said 'O.K.' He was prepared to risk his job and turn that truck around. (Applause.) And in four states, in four states, Teamsters linked up concretely with the student strike and said that they would strike if the students were willing to strike. And factory workers were walking out. And the day after that, we called that strike; there was a record absenteeism of all factories in the Bay Area.

"So, you know, what we're asking is for people to take that little tiny gesture, to show that we're willing to inconvenience ourselves a little bit and to begin to shut down the most obvious machinery of war, such as, and I think it is a good target, that Computation Center. (Cheering, applause.)"

gins announced throughout the building a declaration of trespass. No demonstrators departed, although they conferred amongst themselves and decided to leave voluntarily when the police arrived. Officers Marron, Tamm, and Rosa returned to the building about 4 p.m. to attempt to persuade the occupants to leave voluntarily and heard demands that the war-simulation program be removed from the center. The officers returned again with the information that the Stanford Research Institute work had been stopped, but the occupants demanded a written statement to that effect from the University president.

Soon after 4 p.m., C. D. Marron announced through a bullhorn that the congregation both within and outside the building was an unlawful assembly which should disperse to avoid arrest. There was no immediate response, but as the first platoon of uniformed police arrived and entered the Computation Center, the occupants cleared out without any arrests, some remaining outside the center. While Marron verified the building was unoccupied, the police formed a two-deep "skirmish line." Marron walked around outside the building, repeating his order to disperse.

It was at this time the second incident occurred. A double line of police was facing the crowd which consisted of demonstrators and observers, including members of the faculty. Clusters of demonstrators heckled the police from about 10 feet away. Marron gave the crowd three or four orders to move a wider area away from the Computation Center. Not everyone heard these orders or knew how far back to move. Those who were already farther from the police began to disperse.

Plaintiff reacted to this new order with about three minutes of words and action. He first approached Sergeant Tamm and vigorously challenged the legality of the order to disperse. The crowd shouted support. He also claimed a right to remain as a faculty observer. Tamm disagreed on both points. Plaintiff looked around and saw Dean Lincoln Moses, a faculty observer about to leave. Plaintiff was aware some others were leaving in response to the orders. Plaintiff approached Mr. Moses, shouting to him that he should remain as a faculty observer because the assembly was not illegal and because a police charge and brutality were imminent. Moses halted and began to follow plaintiff, who turned back through the crowd in the direction of the police line, about 50 feet away. He continued to shout that the order to disperse was illegal and that the people had a right to remain. He confronted Tamm face-to-face, loudly disputing the legality of the dispersal order and insisting on his right to remain as a faculty observer. He was aware of a crowd forming around them. There was an attempt by other officers to seize plaintiff, who was then spirited away by his comrades. Then the police charged the crowd.

## The Speech Incidents Were Not Constitutionally Immune
## From Employer Discipline

■ A public employee cannot be disciplined or discharged for expressive conduct protected by the First and Fourteenth Amendments. (*Perry* v. *Sindermann* (1972) 408 U.S. 593, 597-598 [33 L.Ed.2d 570, 577-578, 92 S.Ct. 2694], and cases there cited; *Pickering* v. *Board of Education, supra,* 391 U.S. 563, 574-575 [20 L.Ed.2d 811, 820-821].) Whether the employee's conduct is deemed protected against disciplinary action depends upon a balancing of the interests of the employer and the employee involved in the particular speech incidents. (*Pickering, supra,* 391 U.S. at p. 568 [20 L.Ed.2d at p. 817]; *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 284 [50 L.Ed.2d 471, 481, 97 S.Ct. 568]; *Givhan* v. *Western Line Consol. School Dist.* (1979) 439 U.S. 410, 414-415 [58 L.Ed.2d 619, 623-624, 99 S.Ct. 693].) *Pickering* indicates "some of the general lines along which an analysis of the controlling interests should run" (*id.,* at p. 569 [20 L.Ed.2d at p. 818]), including: (1) whether the communication would interfere with close working relationships (*id.,* at pp. 569-570 [20 L.Ed.2d at pp. 817-818]), (2) whether the communication would provoke conflict or otherwise undermine the employer's operation (*id.,* at pp. 570-571 [20 L.Ed.2d at pp. 818-819]), (3) whether the communication concerned a topic of public interest (*id.,* at pp. 571-572 [20 L.Ed.2d at pp. 818-819]), (4) whether there was an opportunity to rebut or refute any errors in the communication (*id.,* at p. 572 [20 L.Ed.2d at p. 819]), (5) whether the communication shows the employee's incompetence at his position (*id.,* at p. 573, fn. 5 [20 L.Ed.2d at p. 820]), (6) whether the communication was intentionally false (*id.,* at pp. 570, 574-575 [20 L.Ed.2d at pp. 818, 820-821]).

In *Pickering,* a high school teacher published a letter critical of the school board's allocation of funds between educational and athletic programs and which was also critical of the board and superintendent for their methods in informing, or not informing, the district's taxpayers of real reasons why additional tax revenues were being sought by the schools. The court held that dismissal of the teacher was constitutionally improper. The letter, though it contained some erroneous information, was not deliberately or recklessly false (*id.,* at p. 574 [20 L.Ed.2d at p. 820]), the teacher was not shown to be unable to perform his duties (*id.,* at p. 572 [20 L.Ed.2d at p. 819]), the letter did not substantially interfere with working relationships (*id.,* at p. 570 [20 L.Ed.2d at p. 818]), and the statement did not interfere with the regular operation of the school (*id.,* at p. 573 [20 L.Ed.2d at p. 820]). The factual dissimilarities of *Pickering* do not, in our view, preclude the application here of some or all of its guidelines.

*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], provides further guidance, although not concerned with discipline of school employees. At issue there was a high school's punishment of students for wearing black armbands to school in protest of the Vietnam war, a demonstration "akin to 'pure speech'" (*id.,* at p. 508 [21 L.Ed.2d at p. 738]) and protected by the First Amendment (*id.,* at p. 505 [21 L.Ed.2d at p. 736]). The court recognized that students and teachers did not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (*Id.,* at p. 506 [21 L.Ed.2d at p. 737].) The campus is the model of a forum for the robust competition of ideas, including controversial ones. (*Id.,* at pp. 511-513 [21 L.Ed.2d at pp. 740-741].) "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, . . ." (*Id.,* at p. 508 [21 L.Ed.2d at p. 739].) "[M]ore than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" must be shown to justify a prohibition of a particular expression of opinion. (*Id.,* at p. 509 [21 L.Ed.2d at p. 739].) It is only expressive conduct which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" which is not protected by the constitutional guarantee of freedom of speech. (*Id.,* at p. 513 [21 L.Ed.2d at p. 741].) Since wearing armbands was not determined to be disruptive, it could not constitutionally be punished.

██ Plaintiff ignores *Pickering* and relies on cases such as *Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 434, 89 S.Ct. 1827], which held: "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (See also *Hess* v. *Indiana* (1973) 414 U.S. 105, 108-109 [38 L.Ed.2d 303, 307-308, 94 S.Ct. 326].) *Brandenburg* was concerned with establishing a boundary for the imposition of criminal punishment on speech, however, and identifies speech unprotected by the Constitution in that context.

We recognize that the *Brandenburg* test was invoked in *NAACP* v. *Claiborne Hardware Co., supra,* 458 U.S. 886, 927-928 [73 L.Ed.2d 1215, 1245-1246], to determine that the leader of a boycott to protest race discrimination could not be held civilly liable for his speeches on a theory of malicious interference with a business. It also appears *Brandenburg* was invoked in a modified form in *Healy* v. *James* (1972) 408 U.S. 169 [33

L.Ed.2d 266, 92 S.Ct. 2338], wherein a college refused to recognize a student political group as a campus organization, thus affecting the students' First Amendment rights of association. The court found no evidence that the group would be a disruptive influence. (*Id.*, at pp. 188-191 [33 L.Ed.2d at pp. 283-285].) The court indicated disruptive activity would be a basis for finding conduct unprotected, stating at pages 188-189 [33 L.Ed.2d at p. 284]: "The critical line heretofore drawn for determining the permissibility of regulation is the line between mere advocacy and advocacy 'directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action.' *Brandenburg* . . . In the context of the 'special characteristics of the school environment,' [fn. citing *Tinker* v. *Des Moines Independent School District* (1969) 393 U.S. 503, 506] the power of the government to prohibit 'lawless action' is not limited to acts of a criminal nature. Also prohibitable are actions which 'materially and substantially disrupt the work and discipline of the school.' *Tinker* v. *Des Moines Independent School District*, 393 U.S., at 513. Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education."

*Healy* and *Tinker* were concerned with the relationship between a state school and its students, comparing it with the relationship between a state and its general citizenry, and determining students may be subject to somewhat more regulation than other citizens. *Pickering* and its progeny, including *Mt. Healthy* and *Givhan*, however, involve the relationship between a state school and its faculty employees. The Supreme Court has never repudiated the observation in *Pickering, supra,* 391 U.S. 563, 568 [20 L.Ed.2d 811, 817]: "[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." The government as an employer is entitled to expect more of its employees than merely noncriminal conduct. We conclude, in light of *Pickering,* that *Brandenburg* is not the controlling test.[7]

We find further guidance in several decisions by the federal appellate courts which have applied a *Pickering* analysis to teacher protest conduct. In *Rozman* v. *Elliott* (8th Cir. 1972) 467 F.2d 1145, a university professor's discharge was upheld. The professor had participated in an antiwar sit-in demonstration in one university building and was responsible for prolonging

---

[7]Consequently we are not immediately concerned with a number of arguments raised by plaintiff, such as whether there was advocacy of lawless action, whether the speech was likely to produce imminent lawless action, and whether a serious substantive evil was advocated, although as we point out later it appears that plaintiff's conduct also clearly violated the *Brandenburg* standards.

negotiations with the administration regarding the evacuation of the building. He also disregarded a demand by the university president to evacuate the building. In *Duke* v. *North Texas State University* (5th Cir. 1972) 469 F.2d 829 (cert. den. 412 U.S. 932 [37 L.Ed.2d 160, 93 S.Ct. 2760]), the nonrenewal of a university teaching assistant was upheld. She had criticized the school's administration, employing profanity in two speeches, one at a concert which was part of a counterorientation program for new students and another after another concert was closed down. She also authored and helped prepare and circulate a critical leaflet.

In *Whitsel* v. *Southeast Local School District* (6th Cir. 1973) 484 F.2d 1222, a high school teacher's discharge was upheld. A group of students had gathered in the gymnasium to demand an explanation from the school's administration for the dismissal of two popular student teachers based on their participation in the Kent State antiwar demonstration. The superintendent explained the dismissal and directed the students to return to their classes because their assembly was unauthorized. Instead, the students remained to hear a speech from the teacher, who explained he had permitted one of the student teachers to participate in the demonstration and who further suggested the dismissal was political and might be the subject of litigation.

In *Birdwell* v. *Hazelwood School District* (8th Cir. 1974) 491 F.2d 490, a probationary high school teacher's dismissal was upheld. He held a class discussion of the propriety of an imminent visit by military recruitment personnel to the school campus. His view was the visit should not be permitted unless a majority of the teachers and students approved. He indicated that the students, if unified, could keep the military off the campus, as would the students at a nearby university, and suggested the use of physical force. The teacher then confronted three military personnel amidst a number of students, and loudly asserted they were not welcome.

In *Adamian* v. *Jacobsen* (9th Cir. 1975) 523 F.2d 929 (affd. after remand *sub nom. Adamian* v. *Lombardi* (9th Cir. 1979) 608 F.2d 1224, cert. den. 446 U.S. 938 [64 L.Ed.2d 791, 100 S.Ct. 2158]) a university professor's discharge was upheld. In *Adamian,* a tenured professor yelled "[l]et's stop this mother . . ." (*id.,* at p. 931) and others tried to stop a motorcade bringing officials to ceremonies held at the university. He led others in noisy attempts to disrupt the ceremonies and left the stands to join a group of demonstrators on the field and motioned others to join him, thus creating a danger of violent confrontation.

Each of these courts employed a balancing of interests similar to *Pickering* in determining the teacher's conduct was not protected by the First Amend-

ment. Plaintiff does not mention *Rozman* and *Duke,* and he simply dismisses *Whitsel* and *Birdwell* as among "a jumbled list of older cases which are brought out time and again through the defense arguments in support of a weakened free speech right on campus. This repetoire [*sic*] includes student cases, high school cases, conduct cases, and cases of in-class misbehavior."

Plaintiff relies on cases such as *Mabey* v. *Reagan* (9th Cir. 1976) 537 F.2d 1036; *Trotman* v. *Board of Trustees of Lincoln University* (3d Cir. 1980) 635 F.2d 216, cert. den. 451 U.S. 986 [68 L.Ed.2d 844, 101 S.Ct. 2320]; and *Kim* v. *Coppin State College* (4th Cir. 1981) 662 F.2d 1055. In each of these cases, a teacher's First Amendment claims prevailed, at least in part. In *Mabey* v. *Reagan, supra,* 537 F.2d 1036, a probationary college teacher's nonrenewal was at issue. It was based partly on his speaking out of order at an academic senate meeting, while calling some administrators the same names one of them had just applied to the faculty. Applying a *Pickering-Tinker* analysis, the court concluded that it was inappropriate to decide by summary judgment whether his speech was protected. (*Id.,* at pp. 1046-1051.)

In *Trotman* v. *Board of Trustees, supra,* 635 F.2d 216, a number of university teachers pressed a variety of claims of interference with their First Amendment rights by the school administration. The court purported to apply a *Pickering* analysis to a range of expressive conduct, including a telegram to the Governor seeking the college president's removal, picketing by the teachers, and a demonstration during a class. (*Id.,* at pp. 225-226.) Much of the activity, except for disruption of the class, was held protected by the First Amendment.

In *Kim* v. *Coppin State College, supra,* 662 F.2d 1055, two college professors claimed they were denied promotion due in part to their First Amendment activity. The evidence showed one reason they had been denied a pay increase was participation in a student boycott. The court held that a jury should conduct a *Pickering* analysis to determine whether the boycott activity was protected. (*Id.,* at pp. 1062-1066.)

We agree with plaintiff and *Mabey* v. *Reagan, supra,* 537 F.2d 1036, that in order to conduct a *Pickering* analysis a court should be aware of a number of factors, including the differences between the college and the high school environment (*id.,* at pp. 1046-1048), whether the expressive conduct was that of a teacher or a student (*id.,* at p. 1048), and whether the occurrence was on or off campus (*id.,* at pp. 1047-1048).

■ We perceive no great division between the cases plaintiff cites and those he distinguishes. Most of the cases hew to the same line in differen-

tiating expressive conduct by an employee which is constitutionally protected from that subject to discipline. In *Rozman,* the professor's disregard of an administrative order to evacuate an occupied building was "disruptive" and it "substantially interfered with the rights of the other students and faculty to use the building for educational purposes." (*Rozman* v. *Elliott, supra,* 467 F.2d 1145, 1149.) In *Whitsel,* the teacher's speaking to a student assembly declared unauthorized by the administration "encouraged disobedience to the directions given to the students by his superiors to return to classes," counseling insubordinate action. (*Whitsel* v. *Southeast Local School District, supra,* 484 F.2d 1222, 1228.) In *Birdwell,* the teacher's disputation in and out of class of the presence of military personnel on campus "interfered with the educational process," promoted violent action, and disrupted " 'the orderly and disciplined operation of the school . . . .' " (*Birdwell* v. *Hazelwood School District, supra,* 491 F.2d 490, 493-494.) Adamian's acts were "intentionally disruptive." (*Adamian* v. *Lombardi, supra,* 608 F.2d 1224, 1227.)

The question for trial in *Mabey* v. *Reagan, supra,* 537 F.2d 1036, 1050, was "the severity of the disruption" of the academic senate meeting by the teacher's outburst. The court contrasted other cases, such as *Adamian* v. *Jacobsen,* observing at page 1049: "Both cases exhibit either premeditated disruption or a long-standing lack of concern about potential disruption. This is not to say that one act, sufficiently egregious, may not sink to the unprotected level. Rather, the cases imply that an isolated impassioned statement is unlikely to create sufficient disruption to meet the 'material and substantial' test of Tinker. . . . [¶] Another factor, implicit in *Adamian, supra,* is the presence of violence or an incitement to violence."

In *Trotman* v. *Board of Trustees, supra,* 635 F.2d 216, 226, the expressive conduct found constitutionally unprotected was the disruption of a class. An issue for the jury in *Kim* v. *Coppin State College, supra,* 662 F.2d 1055, 1065, was whether the professor's involvement "in the boycott actually resulted in disruption of school activities." The actual disruption was to be evaluated in context. The federal cases thus demonstrate that while *Pickering* was not concerned solely with the disruptive impact of an employee's conduct, when it crosses that line the employer's interests outweigh the employee's.

It is clear that the constitutional freedom to speak does not license a teacher to substantially disrupt and interfere with the normal operations of his or her employer, whether they be instruction, research, or administration. Expressive conduct which may not justify criminal or civil liability may be the subject of employer discipline. (*Franklin* v. *Atkins, supra,* 409 F.Supp. 439, 451; see *Mabey* v. *Reagan, supra,* 537 F.2d 1036, 1046.)

 Plaintiff's expressive conduct in our view was well out of constitutional bounds. Speech which results in disruption, which materially interferes with school activities, or impairs discipline is not constitutionally protected against an employer's response. (See *Adcock* v. *Board of Education, supra,* 10 Cal.3d 60, 65, 68-69.)[8] That description fits plaintiff's White Plaza speech and his interference with the police dispersal order at the Computation Center.

Turning first to the latter incident—the occupation of a university building by demonstrators itself was a disruption of normal research operations. Plaintiff perceived a potential for violence in the ensuing face-off between the police and the protestors. His loud, emotional disagreement with the police dispersal order, particularly in light of his acknowledged leadership role in protest activities, could only serve to prolong the existing state of campus disorder. His example caused some members of the crowd to disregard the order. His aggressive, challenging conduct was a material interference with an attempt to restore normalcy to the campus.

The following statement in *Mabey* v. *Reagan, supra,* 537 F.2d 1036, 1046, is particularly apt: "The behavior at issue here was not symbolic speech in the usual sense. [Citations.] It had a vocal and unmistakably 'speech' element embedded in a matrix of movement, interruption of the proceedings and refusal to bow to authority. Although the cognitive content of [his] act may be severed from the movement, much of the impact of his expression lies in its emotive content, which is not severable from his mode of expression. We thus consider the totality of [his] behavior."

Plaintiff makes other arguments about the Computation Center incident which simply miss the point of *Pickering* and *Tinker* and fail to appreciate the obligations of his status as a university professor. He asserts he had a right to briefly and vigorously challenge the legality of a police officer's command, relying on cases such as *Norwell* v. *City of Cincinnati* (1973) 414 U.S. 14 [38 L.Ed.2d 170, 94 S.Ct. 187]. Those cases are concerned with whether criminal punishment can be imposed for the disorderly conduct of nonprovocatively vocally objecting to police orders. As already observed, an employer's code of conduct may hold an employee to a higher standard than merely noncriminal behavior. He also argues he was justified

---

[8]Plaintiff has invited us to find greater protection in the California constitutional free speech provisions (art. I, § 2). While this argument has prevailed in other cases (e.g., *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341], aff'd *sub nom. Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 81 [64 L.Ed.2d 741, 751, 100 S.Ct. 2035]), we observe federal law has been leading the way for California cases involving discipline of employees for free speech activities, and we see no reason to depart from its essential reasonableness.

in challenging the police order because it was illegal. Cases like *In re Brown* (1973) 9 Cal.3d 612 [108 Cal.Rptr. 465, 510 P.2d 1017] (cert. den. *sub nom. California* v. *Brown,* 416 U.S. 950 [40 L.Ed.2d 300, 94 S.Ct. 1959]), on which plaintiff relies, do not seek to define what sort of expressive protest behavior an employer must tolerate before imposing punishment, however. They are concerned with when an assembly may be held unlawful for purposes of criminal punishment. There is no need in this case to determine the legality of the police orders before regarding plaintiff's conduct as disruptive of campus order.

■ We turn next to the White Plaza speech. The expressive behavior was more purely speech and it occurred in "a forum for free and open discussion of the problems vitally affecting the institution and its members." (*Adcock* v. *Board of Education, supra,* 10 Cal.3d 60, 68.) The speech alone did not materially disrupt the University's operations. However, we find it to be significantly different from the type of criticism of school policies found protected in cases like *Adcock.* There, no showing was made that the teacher's "speeches disrupted classrooms, teaching efficiency, or in any way led to a potentially dangerous situation at the school." (*Id.,* at p. 69.)

We need not, as plaintiff suggests, engage in a meticulous textual analysis of his speech to understand it. It contained more than abstract disagreement with school policies; it was an exhortation to disruptive action. He challenged the students to assume a leadership role in the antiwar protest movement, describing the impact of a student strike on working people the previous year. He ridiculed a student strike as a "fake" in which they risked nothing, but asked them to set an example. Plaintiff, a leader in the antiwar protest movement, called for a strike to shut down some of the University's activities, specifically the Computation Center. He now characterizes his identification of the Computation Center as a target as "an afterthought," but this revisionism is a distortion we reject.

Plaintiff's advocacy of a shut down of the Computation Center in this context was directed to and likely to incite immediate material disruption of the University's work and consequently was entitled to no constitutional protection against his employer's response. "[H]is actions materially and substantially interfered with University activities and discipline" although they "may not have been criminally culpable." (*Franklin* v. *Atkins, supra,* 409 F.Supp. 439, 451.)

### The Propriety of the Trial Court's Remand to the University

■ Plaintiff contends that once the trial court determined his expressive conduct during the Old Union rally should not have been a basis for em-

ployer discipline, it should have conducted further hearings to determine whether the University would have dismissed him anyway, rather than remanding this question to the University. He relies primarily on *Mt. Healthy City Board of Ed.* v. *Doyle, supra,* 429 U.S. 274 [50 L.Ed.2d 471], and its progeny. There the trial court had determined a teacher's contract had not been renewed due in part to protected free speech and it therefore ordered his reinstatement. The trial court reasoned that if a nonpermissible reason played a substantial part in the nonrenewal decision, the decision could not stand. (*Id.*, at p. 284 [50 L.Ed.2d at p. 481].) The Supreme Court overruled this reasoning, observing: "A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." (*Id.*, at p. 285 [50 L.Ed.2d at p. 482].) ■ The court held First Amendment rights would be sufficiently vindicated by the following rule: first, the employee bears the burden of proving his protected conduct was a substantial or motivating factor in his employer's discipline decision. Then the burden shifts to the employer to prove that it would have reached the same decision anyway. (*Id.*, at p. 287 [50 L.Ed.2d at p. 483]; accord *Givhan* v. *Western Line Consol. School Dist., supra,* 439 U.S. 410, 416 [58 L.Ed.2d 619, 625]; *Shimoyama* v. *Board of Education, supra,* 120 Cal.App.3d 517, 524-525.) Neither teacher in *Mt. Healthy* and *Givhan* was afforded an administrative hearing in which to air First Amendment claims.

Plaintiff also relies on *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, as establishing a rule similar to *Mt. Healthy.* There the high school teacher did participate in administrative hearings in which he attempted to present evidence showing the "real reason for his dismissal" was his employer's dissatisfaction with his exercise of free speech rights. The evidence was not received to establish his claim, however, but only admitted on a limited basis for impeachment of credibility (6 Cal.3d at pp. 582-583). The court determined the school board should have considered the teacher's claim. (*Id.*, at pp. 587-588.) Because the administrative board did not properly face the constitutional argument, the Supreme Court remanded the case to the trial court with an order that the trial court issue a writ of mandate to the board to make a determination whether the dismissal was based on constitutionally impermissible considerations. (*Id.*, at pp. 593-594.)

Under *Bekiaris,* the board initially is to determine the true basis for the discharge and whether it was justifiable without reference to constitutionally protected conduct. (*Id.*, at pp. 592-593.) On review, the trial court is to independently determine the true basis for the discharge, although otherwise reviewing the board's decision under the substantial evidence test. The dis-

charge should be upheld unless there is no constitutionally sufficient justification. (*Id.*, at p. 593.) (Accord, *Miller* v. *Chico Unified School Dist.* (1979) 24 Cal.3d 703, 715-716 [157 Cal.Rptr. 72, 597 P.2d 475].)

Defendants contend a *Mt. Healthy* approach is inappropriate for a case involving judicial review of an administrative record. The short answer is that it has been done. (E.g., *Nicholson* v. *Board of Educ. etc.* (9th Cir. 1982) 682 F.2d 858, 862.) It may be difficult, though not impossible, based on some administrative records, to determine whether an employee was dismissed for constitutionally impermissible reasons.

In the case before us, the original faculty board determined: "[E]ach of the offenses is a serious one; since we find Professor Franklin culpable on three charges, we need not decide whether any one alone would justify dismissal." Thus, it declined to establish whether dismissal would have been appropriate for each incident alone. It may yet have been possible for the trial court to surmise whether the Board would have dismissed plaintiff for the two speech incidents it found subject to punishment. But we see no harm in the trial court remanding the case to the faculty board to determine whether dismissal was justified based on these two incidents. In *Miller* v. *Chico Unified School Dist., supra,* 24 Cal.3d 703, 716, the Supreme Court advised the trial court on remand: "[I]f the court cannot determine *whether or not* the Cloud memoranda played a crucial role in the board's decision of reassignment, the court should order the board to reconsider its decision of reassignment without reference to the Cloud memoranda." (Italics in original.)

Under *Mt. Healthy,* the ultimate question to be answered is whether the employee would have been disciplined without consideration of constitutionally impermissible grounds. We ascertain no prejudice to plaintiff if the trial court afforded him more administrative hearings than contemplated by *Mt. Healthy.* The remand to the administrative board determined the punishment for plaintiff's unprotected conduct alone.

Plaintiff contends the trial court not only erred in remanding the case to the University, but also in reviewing what returned from the University. The court concluded the school had not abused its discretion in dismissing plaintiff. Plaintiff argues the trial court did not independently determine whether the given reasons for dismissal were the true reasons. We are not sure how this contention arose in these proceedings. The original complaint did not assert that the given reasons were not the true reasons, but that the given reasons were constitutionally impermissible. It appears that once the trial court determined the University could rely on two of the speech inci-

dents, plaintiff began to argue that in fact his dismissal was based on grounds other than those given.

Plaintiff argues he was dismissed for his "perception of reality," not merely for his unprotected expressive conduct. The 1972 faculty advisory board acknowledged an awareness of the difference between plaintiff's set of perceptions and those of the majority of Stanford faculty members. They took into account his different perception of reality as it explained his pattern of conduct in considering what sanction to impose. The Board stated, however: "The real issue in these hearings is Professor Franklin's behavior on the offenses charged, not his political views." The 1980 faculty advisory board echoed these concerns. They considered his "point of view" insofar as it included "encouragement of violent or coercive tactics against the members of the university community."

*Healy* v. *James, supra,* 408 U.S. 169 [33 L.Ed.2d 266], validates these considerations by the faculty board. The court held that a student group could not be denied recognition simply because the university president found its philosophy abhorrent. (*Id.,* at pp. 187-188 [33 L.Ed.2d at pp. 282-283].) On the other hand, if the group announced its unwillingness to be bound by reasonable school rules governing conduct, nonrecognition might be justified. (*Id.,* at pp. 191-194 [33 L.Ed.2d at pp. 285-287].) Similarly, nonrecognition could be justified if there were support for the conclusion that the group "posed a substantial threat of material disruption." (*Id.,* at p. 189 [33 L.Ed.2d at p. 284].)

The faculty board thus was entitled to consider plaintiff's viewpoint insofar as it promised a repetition of disruption. Severing the employment relationship was determined necessary to preserve campus order. Plaintiff does not challenge the severity of the discipline, but only its basis.

We are not convinced that the trial court failed to independently determine whether the given reasons for plaintiff's dismissal were the true ones, if indeed the issue was raised by the pleadings. Assuming the trial court did not meet this duty under *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, 593, however, we do not see any prejudice to plaintiff or a resulting miscarriage of justice. (Cal. Const., art. VI, § 13, Code Civ. Proc., § 475.)

Having independently reviewed the record, we conclude plaintiff has not established defendants terminated him for any constitutionally impermissible reasons.

### The University's Standards

Plaintiff contends the standard he was dismissed for violating was unconstitutionally vague in that the regulations upon which the University

relied in dismissing him were not sufficiently clear to provide adequate notice he could be dismissed for speech activity; the regulations were enforced in a discriminatory manner; and dismissing him pursuant to the regulations had a chilling effect on the exercise of First Amendment rights at the University.

 The Supreme Court stated the void for vagueness doctrine in *Connally* v. *General Const. Co.* (1926) 269 U.S. 385 [70 L.Ed. 322, 46 S.Ct. 126]: "[A] statute which either forbids or requires the doing of an act in terms so vague that men [and women] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Id.,* at p. 391 [70 L.Ed. at p. 328].) The notion of due process requires the prohibition be clearly defined in order to provide adequate notice or warning of the conduct which is prohibited. (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294].) Moreover, the requirement of specificity is necessary to avoid "arbitrary and discriminatory" application of the standard. (*Ibid.*) Where First Amendment rights are at issue, an even greater degree of specificity is demanded, because the vague standard may chill the exercise of those rights. (*Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 604 [17 L.Ed.2d 629, 641, 87 S.Ct. 675]; *Smith* v. *California* (1959) 361 U.S. 147, 151 [4 L.Ed.2d 205, 210, 80 S.Ct. 215]; *California School Employees Assn.* v. *Foothill Community College Dist.* (1975) 52 Cal.App.3d 150, 156 [124 Cal.Rptr. 830].)

 The statement of policy on appointment and tenure incorporated into plaintiff's contract with the University provides a tenured professor may be dismissed for "substantial and manifest neglect of duty, or personal conduct substantially impairing the individual's performance of his [or her] appropriate function within the university community." This regulation does not explicitly state speech falls within its scope. However, its scope is clarified by the policy on campus disruption (Policy). The Policy, ratified by the Academic Senate in 1968, provides in relevant part: "Because the rights of free speech and peaceable assembly are fundamental to the democratic process, Stanford firmly supports the rights of all members of the University community to express their views or to protest against actions and opinions with which they disagree. [¶] All members of the University also share a concurrent obligation to maintain on the campus an atmosphere conducive to scholarly pursuits; to preserve the dignity and seriousness of University ceremonies and public exercises; and to respect the rights of all individuals. [¶] The following regulations are intended to reconcile these objectives: [¶] It is a violation of University policy for a member of the faculty, staff, or student body to (1) prevent or disrupt the effective carrying out of a University function or approved activity, such as lectures, meet-

ings, interviews, ceremonies, the conduct of University business in a University office, and public events; (2) obstruct the legitimate movement of any person about the campus or in any University building or facility. . . ."

■ Imprecision, if any, in a regulation may be cured by interpreting the standard so as to narrow its broad scope. Traditional standards of academic behavior may be considered in interpreting terms such as "duty" and "appropriate function." (*Adamian* v. *Jacobsen, supra,* 523 F.2d 929, 932. See also *Arnett* v. *Kennedy* (1974) 416 U.S. 134, 149 [40 L.Ed.2d 15, 30, 94 S.Ct. 1633]; *Parker* v. *Levy* (1974) 417 U.S. 733 [41 L.Ed.2d 439, 94 S.Ct. 2547].) ■ Indeed, a statute or regulation must be construed, if reasonably possible, to preserve its constitutionality. (*Adamian, supra,* at p. 932; *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 305 [138 Cal.Rptr. 53, 562 P.2d 1302].) ■ An agency's interpretation of regulations is of controlling weight unless inconsistent or plainly erroneous. (*Adamian, supra,* at p. 932; *United States* v. *Larionoff* (1977) 431 U.S. 864, 872-873 [53 L.Ed.2d 48, 56-57, 97 S.Ct. 2150]; *Young* v. *State Board of Control* (1979) 93 Cal.App.3d 637, 640 [156 Cal.Rptr. 91].)

■ The instant case is quite similar to *Adamian, supra,* 523 F.2d 929 (affd. after remand 608 F.2d 1224), relied on by the trial court, in which a university regulation challenged for vagueness and overbreadth was upheld. As indicated above, the professor in *Adamian* attempted to block a motorcade, ignored the university president's call for quiet during school ceremonies, and charged onto the field during the ceremonies. The Board of Regents (Regents) determined this conduct was prohibited by university regulation and dismissed the professor, because he failed to "exercise appropriate restraint." The reviewing court employed a "rigorous" test (523 F.2d at p. 933) and held the regulation constitutionally adequate, provided it was interpreted consistent with a written interpretation which confined its application to "serious intemperateness of expression, intentional falsehood, incitement of misconduct, . . ." (*Id.,* at p. 934.) The court then found the Regents had construed the regulation consistent with this interpretation. (608 F.2d 1224, 1228.)

Plaintiff argues, however, *Adamian* is distinguishable from the case at hand, because in *Adamian* the court relied on a written interpretation of the regulation by the American Association of University Professors (AAUP) to cure its "facial invalidity" and the interpretation had been adopted seven years before the professor's actions. We find no support in *Adamian* for this position. The *Adamian* court had no indication when the Regents had adopted the AAUP interpretation and was concerned only that the Regents' interpretation was the same as that of the AAUP.

Plaintiff goes on to attack the faculty board's interpretation of the University regulations for its reliance on "a web of largely unwritten rules as tough and living as the British Constitution." We need not discuss whether campus traditions proscribed plaintiff's conduct, however, because the written regulations did so.

Plaintiff asserts there is other evidence apart from the words of the University's regulations which make them vague as applied. He argues that other speakers at the White Plaza and Old Union rallies used similar language without being disciplined; that in prior years other faculty members were involved in sit-ins without discipline; and that faculty members who engaged in violent conduct were subject to lesser discipline. These equal protection arguments have no place in analyzing the clarity of a written regulation; in any event most of this evidence was not presented to the 1972 Faculty Board or the trial court when each ruled on the vagueness argument. He also attempts to demonstrate by affidavits of other faculty members that his discipline had a chilling effect on First Amendment rights. We question whether the vagueness of a regulation could be proved by the opinion of experts or lay witnesses; in any event, these affidavits do not address this issue and are irrelevant.

██ School regulations need not be spelled out with the precision of a criminal code. (*Esteban* v. *Central Missouri State College* (8th Cir. 1969) 415 F.2d 1077, 1088, cert. den. 398 U.S. 965 [26 L.Ed.2d 548, 90 S.Ct. 2169]; *Shamloo* v. *Miss. State Bd. of Trustees, etc.* (5th Cir. 1980) 620 F.2d 516, 522.) We find the Stanford regulations at issue constitutionally clear as interpreted by the faculty advisory board to apply to plaintiff's conduct.

The judgment is affirmed.

Panelli, P. J., and Brauer, J., concurred.

**BRAUER, J.,** Concurring.—We judges and lawyers are used to dealing in fine distinctions. Should we apply the *Brandenburg* standard? Or is *Pickering* closer in point? Can certain language in *Bekiaris* be reconciled with other parts of that opinion? And if so, what is the impact of that case on ours? I join in the opinion of the court and do not disparage this technique. By and large, it has served us well.

But sometimes it is necessary to lean back and look at first principles. This is such a time.

A university is a marketplace of ideas or it is nothing. It is a home for sober reflection, for critical inquiry and analysis, for vigorous advocacy,

for dialogue, all in pursuit of the truth. The imposition of one's cause or point of view by coercion upon those of different persuasion is totally inconsistent with a university's process and function.

Professor Franklin incited students forcibly to shut down a Stanford facility devoted to research of which they disapproved. Believing or at least proclaiming that the police were about to resort to brutality, he embarked upon speech and action designed to encourage students to defy the dispersal order thereby risking arrest, possible criminal conviction with its devastating effect on the youngsters' future and, given his perception of the police, physical assault. He now makes the incredible argument that he had no reason to suppose his conduct to be beyond the pale for a professor so as to subject him to discipline.

If that is protected speech, if a university is compelled to retain such a man in its employ, and retain him in the capacity of mentor, the Constitution of the United States is the instrument of its self-destruction. It isn't.

A petition for a rehearing was denied October 11, 1985, and appellant's petition for review by the Supreme Court was denied December 31, 1985. Bird, C. J., did not participate therein.